833 A.2d 1040

**John Leon GREGG**

v.

**STATE of Maryland.**

**No. 112, Sept. Term, 2002.**

Court of Appeals of Maryland.

Oct. 16, 2003.

**518**

Julia Doyle Bernhardt, Assistant Public Defender (Stephen E. Harris, Public Defender, and Deborah S. Richardson, Assistant Public Defender, on brief), Baltimore, for petitioner.

Edward J. Kelley, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

HARRELL, Judge.

## I.

John Leon Gregg, Petitioner, was charged in the District Court of Maryland, sitting in Anne Arundel County, with second degree assault as the result of his swinging a bag at a ten year old girl and causing her to fall off of her bicycle as she rode past him on the sidewalk in their neighborhood. The District Court ordered a competency evaluation of Petitioner, which evaluation was conducted at Crownsville Hospital Center from 14 September 2001 until 19 November 2001. The written report prepared by the Hospital staff regarding Gregg's mental health status was submitted to the District Court. It concluded that Gregg had "Delusion Disorder, Persecutory Type" and "Schizoid, Avoidant and Dependant Personality Disorder." Although acknowledging that Gregg was able "to understand the roles of courtroom personnel and courtroom procedures" and that he had been able to "discuss his charges, possible pleas and possible penalties with his evaluators," the report nonetheless ultimately opined that Gregg was not competent to stand trial because he was "not able to understand the nature and object of the proceedings against him and to assist in [his] own defense."

Gregg appeared in the District Court for a competency hearing on 19 November 2001. The hearing judge questioned Gregg as follows:

COURT: Okay. And what are you charged with; do you know?

GREGG: Second-degree assault.

COURT: All right. And why are you charged with that? What do they say you did. You don't have to admit to anything, but what do they say you did?

GREGG: They claim I swung an object at a 10–year old girl on a bicycle and raised a welt on her, and that there were witnesses.

COURT: All right. And do you understand what could happen, if you were found guilty?

GREGG: Up to ten years, but I don't know the exact sentencing.

COURT: And where were you living prior to being arrested?

GREGG: 177 Sillery Bay Road, Pasadena, Maryland.

COURT: Do you live by yourself or did have friends—

GREGG: By myself.

COURT: Okay. And do you have a job?

GREGG: No, sir.

COURT: Were you receiving some kind of assistance?

GREGG: No, sir.

COURT: How were you surviving?

GREGG: Interest on savings.

COURT: Are you supposed to be taking any kind of medication on a regular basis?

GREGG: No, sir.

COURT: Do you have any idea what day of the year it is or what month it is?

GREGG: It's Monday, November 19th, 2001.

COURT: Do you know what the purpose of a lawyer is?

GREGG: Of a lawyer?

COURT: Yeah.

GREGG: Well, a defense lawyer helps me speak and advises me, and the prosecutor presents the State's case against me.

COURT: Are there times when you feel that you don't have a good grasp on what's going on around you?

GREGG: No.

Dr. Mohammed Ajanah, Director of Forensic Psychiatry at Crownsville Hospital Center and one of Gregg's evaluators, then testified regarding the conclusions of the competency report. Dr. Ajanah initially reasserted that Gregg was not competent to stand trial because the doctor believed the defendant did not have a "rational understanding" of the charges against him. Dr. Ajanah related to the court that Gregg had told his evaluators at Crownsville that he believed the charges against him were fabricated and that they resulted from a conspiracy between the judicial system and his neighbors. Dr. Ajanah further described Gregg's conspiracy theory, relating that Gregg believed the judicial system was "out to get him" and was responsible for instigating the neighborhood children into harassing him. When asked whether it was his belief that Gregg would be able to assist with his defense, Dr. Ajanah testified that he did not believe so, but temporized that opinion by stating "I have to qualify that, because competency is a day-to-day issue."

The judge then questioned Dr. Ajanah about his impressions regarding Gregg's testimony that day before the court while Dr. Ajanah was present:

COURT: Now, I've obviously had a very brief interaction with Mr. Gregg here this morning and observed. Do you think what I saw here today and what I heard here today is typical of the mental process or not typical?

DR. AJANAH: It's not typical.

COURT: How do you explain what I saw and heard today with the observations that you made?

DR. AJANAH: I think what we saw today—again, he has the ability to define what the various courtroom personnel

do. Our concern is the framework he based his judgments on, for example, about the charges. And he has told us if he, you know, were in the same situation that he was in, he was going to do the same thing. He still firmly believes that the children in his neighborhood have been set up, essentially, to harass him by the system, by the government, by the judicial system. And we believe that if Mr. Gregg were back in his neighborhood, he's going to incur the same type of charges.

COURT: So it's my understanding that your concern is about what he might do under certain similar circumstances outside of the facility. In other words, you're concerned that he's not stable on a long-term basis and that he might violate again.

DR. AJANAH: Exactly.

COURT: Although, for the moment, it appears that he is, at least stable, to assist the defense and able to understand the nature of the ongoing proceedings; is that—I'm not—I have put words in your mouth—

DR. AJANAH: Yeah.

COURT:—but I don't want you to (unintelligible) if you disagree with me. Am I understanding correctly?

DR. AJANAH: Yeah. For the moment, because of the structure, I think, yeah, he could—you know, he could go to the competency hearing and be competent today. But I don't believe that, you know, he's not a danger.

COURT: Okay. He could be competent and still dangerous.

DR. AJANAH: Yes.

COURT: That's one of the parameters that exist, right?

DR. AJANAH: Yeah. Usually, in competencies, you address dangerousness when you find somebody to be not competent, you know.

COURT: Right.

DR. AJANAH: And most of the time, when you are competent, you assume they are not dangerous. You're not

required to address dangerousness, if somebody is competent.

COURT: Although somebody who is perfectly competent can still be dangerous.

DR. AJANAH: Yeah, sure.

Based on the court's assessment of Gregg's behavior before the court, the Crownsville report, and Dr. Ajanah's testimony, the District Court judge concluded that Gregg was competent to stand trial:

I think, as Dr. Ajanah stated, competency is a day-to-day question, and I can't say what it was like a month ago, but I, certainly, don't have any feeling today that Mr. Gregg is not competent. He may be suffering from a variety of mental illnesses, and it may cause a problem in the future, and it may have caused a problem in the past, but the function I have here today is very limited; it's to determine whether he can stand trial or not. And I believe, at least, that at this point in time, he can stand trial.

Now, what happens as a result of that trial, what happens if he's found guilty or he's found not guilty is a separate question that has to be resolved another time. It may be that, for any number of reasons that are not necessarily within the confines of my hearing today, that he needs some assistance and he needs some hospitalization, but I'm not sure that the competency question is (unintelligible) so I do find the Defendant is competent at the moment.

And I'd like to know, at this point,—well, he was held on this CR–51 [1] (unintelligible) now, I can say this; that he has been evaluated, and so the purpose of the CR 51 has been satisfied, and at this moment, I do believe the Defendant is competent. If there is a reason to feel that he needs to be hospitalized further, then there are other processes that are available, and I'm not making any decisions on those pro-

---

**1.** The CR–51 is the form used by the court to order a defendant's commitment to the Department of Health and Mental Hygiene for examination as to competency to stand trial, as authorized by Maryland Code (1982, Repl.2000), Health—General Article, § 12–104.

cesses; that I believe at this time, with respect to the criminal case and with respect to the competency case, that the Defendant is competent.

Gregg subsequently prayed a jury trial and the case was transferred to the Circuit Court for Anne Arundel County. No transcript of the competency hearing in the District Court accompanied the case when transferred to the Circuit Court. Although the CR 51 order was included in the District Court documents forwarded to the Circuit Court, the Crownsville competency report was not.

The Circuit Court conducted a hearing on 5 December 2001 with respect to Gregg's proposed waiver of his right to counsel. Gregg explained to the court that he wanted to waive his right to counsel because he did not want to pay for an attorney. Further, Gregg did not want to risk having to pay for the services of the Public Defender's Office in the event that he was determined later not to qualify for free representation by that office. Gregg stated that he perceived the case to be "straightforward" and that he wanted to handle it himself. The court advised Gregg of his right to counsel, referred him to the Public Defender's Office nonetheless, and set the case for trial.

On 10 January 2002, the court accepted Gregg's waiver of counsel as knowing and voluntary. He was convicted by a jury of second-degree assault. The court imposed a sentence of five years' imprisonment and suspended all but six months in favor of five years' probation. Additional facts from the appellate record will be supplied later as relevant to our analysis of the issues.

## II.

The Court of Special Appeals considered in Gregg's appeal, where he was represented by the State Public Defender's Office (as he is in this Court), the following issues [2]: (1)

---

**2.** Gregg also raised the following issues, which are not pertinent to this appeal, before the intermediate appellate court: **(IV)** whether Gregg

whether the circuit court erred in failing to inquire into his competency to stand trial; (2) whether the circuit court erred in failing to inquire into his competency to waive counsel; and (3) whether the circuit court followed the procedures set forth in Maryland Rule 4–215 regarding Gregg's waiver of his right to counsel. In an unreported opinion, the intermediate appellate court affirmed the judgment of the Circuit Court. Gregg argued that his "bizarre" behavior at trial, combined with his "history" of mental illness, should have triggered the trial court's *sua sponte* obligation to conduct a hearing on his competency to stand trial. He also asserted that the trial court had a further *sua sponte* duty, under the circumstances, to inquire more extensively into his competency to waive counsel. In addition, Gregg claimed that Maryland Rule 4–215 [3] requires that the record show full compliance with the

---

was given proper notice under Maryland Rule 4–342(d) of the letters that were presented to and considered by the court during sentencing; (V) whether the trial court erred in failing to inquire into Gregg's allegation of jury tampering; (VI) whether the trial court erred in allowing the state to introduce perjured testimony; and (VII) whether the trial court erred in allowing the state to violate Maryland Rule 4–263.

**3.** Maryland Rule 4–215 provides in part:

(a) *First appearance in court without counsel.* At the defendant's first appearance in court without counsel, or when the defendant appears in the District Court without counsel, demands a jury trial, and the record does not disclose prior compliance with this section by a judge, the court shall:

(1) Make certain that the defendant has received a copy of the charging document containing notice as to the right of counsel.

(2) Inform the defendant of the right to counsel and of the importance of assistance of counsel.

(3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.

(4) Conduct a waiver inquiry pursuant to section (b) of this Rule if the defendant indicates a desire to waive counsel.

(5) If trial is to be conducted on a subsequent date, advise the defendant that if the defendant appears for trial without counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel. . . .

(b) *Express waiver of counsel.* If a defendant who is not represented by counsel indicates a desire to waive counsel, the court may not

Rule every time a defendant requests to discharge defense counsel or elects to proceed without counsel. Gregg noted that the advisements were given to him piecemeal, in direct contradiction to Rule 4–215 and this Court's holding in *Johnson v. State*, 355 Md. 420, 735 A.2d 1003 (1999).

The intermediate appellate court, relying on *Thanos v. State*, 330 Md. 77, 85, 622 A.2d 727, 730 (1993), held that, although Gregg had engaged in certain "strange" behavior, the record supported the conclusion that he (1) understood the proceedings to which he was a party and (2) was able to assert "his rights as they arose throughout the proceedings." The court further concluded that Gregg was competent to, and did, affect a knowing and intelligent waiver of his right to counsel. In reply to Gregg's third contention, that he was not properly

accept the waiver until it determines, after an examination of the defendant on the record conducted by the court, the State's Attorney, or both, that the defendant is knowingly and voluntarily waiving the right to counsel. If the file or docket does not reflect compliance with section (a) of this Rule, the court shall comply with that section as part of the waiver inquiry. The court shall ensure that compliance with this section is noted in the file or on the docket. At any subsequent appearance of the defendant before the court, the docket or file notation of compliance shall be prima facie proof of the defendant's express waiver of counsel. After there has been an express waiver, no postponement of a scheduled trial or hearing date will be granted to obtain counsel unless the court finds it is in the interest of justice to do so.

. . . .

(e) *Discharge of counsel—Waiver.* If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance.

advised of his right to counsel, the intermediate appellate court rejected Gregg's challenge because the circuit court judge, under the circumstances, cumulatively gave him each and every on-the-record advisement required by Rule 4–215.

We granted Gregg's petition for writ of certiorari, *Gregg v. State,* 372 Md. 684, 814 A.2d 570 (2003), to consider the following questions:

Whether a criminal defendant's competence to stand trial is determinative of the issue of competence to waive counsel.

Whether the Circuit Court had a duty to make an inquiry into Gregg's competence to stand trial and to waive counsel.

Whether the Court of Special Appeals erred in concluding that piecemeal compliance by two different judges of the Circuit Court over the course of two separate hearings satisfied the dictates of Rule 4–215.

### III.

### A.

Gregg begins with this Court by making the point that competence to stand trial is the "foundational right for the effective exercise of a defendant's other rights in a criminal trial." *Medina v. California,* 505 U.S. 437, 457, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353, 371 (1992). The Fourteenth Amendment to our federal Constitution "prohibits the criminal prosecution of a defendant who is not competent to stand trial," *Roberts v. State,* 361 Md. 346, 359, 761 A.2d 885, 892 (2000), and the Legislature has placed the duty to determine competence to stand trial on the trial court. *Roberts,* 361 Md. at 357, 363–67, 761 A.2d at 894. Maryland Code (2001), Criminal Procedure Article, § 3–104 provides, in part:

(a) *In general.*—If, before or during trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on the evidence presented on the record, whether the defendant is incompetent to stand trial.

(b) *Court action if defendant found competent.*—If, after receiving evidence, the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practicable or, if already begun, shall continue.

(c) *Reconsideration.*—At any time during the trial and before verdict, the court may reconsider the question of whether the defendant is incompetent to stand trial.

Section 3–101(f) defines "incompetent to stand trial" to mean "not able (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense."

Gregg argues that the Maryland test tracks the federal standard of competency, that being "whether [the accused] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Raithel v. State,* 280 Md. 291, 298, 372 A.2d 1069, 1073 (1977) (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)). He asserts that Maryland prescribes two prerequisites to a finding of competency: "the accused must have 'a rational as well as factual understanding of the proceedings against him, [and] must at the trial have 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" *Raithel,* 280 Md. at 299–300, 372 A.2d at 1073–74 (quoting *Dusky,* 362 U.S. at 402, 80 S.Ct. at 789, 4 L.Ed.2d at 825). Gregg enumerates that the trial court's duty to determine the competency of the accused may be triggered in any of three ways: (1) upon motion of the accused; (2) upon motion of the defense counsel; or (3) upon a *sua sponte* inquiry by the court triggered by the court's concern as to the defendant's competency to stand trial. *Thanos,* 330 Md. at 85, 622 A.2d at 730. Once the duty is triggered by any of these means, § 3–104(a) mandates that "the court *shall* determine whether the defendant is competent to stand trial." Competency thereafter is to be determined according to the proof quantum of beyond a reasonable doubt. *Roberts,* 361 Md. at 366, 761 A.2d at 896; *Raithel,* 280 Md. at 297, 372 A.2d at 1072.

Gregg insists that the Circuit Court should have conducted an inquiry into his competency based on his mental health history, the Crownsville report generated for the District Court proceeding, and his behavior at trial in the Circuit Court. For legal support, he directs our attention to passages from at least two United States Supreme Court cases, *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

The Supreme Court held that a criminal defendant had not waived the issue of competency by failing to request a competency hearing and stated that "[w]here the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing pursuant to [the Illinois statute]." *Pate*, 383 U.S. at 385–86, 86 S.Ct. at 842, 15 L.Ed.2d at 822. The Supreme Court wrote that although the defendant displayed a degree of "mental awareness" in his "colloquies with the trial judge," "this reasoning offers no justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior." *Id.* The Court concluded that "[w]hile Robinson's demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." *Id.*

In *Drope v. Missouri*, the Supreme Court revisited its reasoning in *Pate v. Robinson*, explaining that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 420 U.S. at 180, 95 S.Ct. at 908, 43 L.Ed.2d at 118. Petitioner interprets these decisions to mean that a trial judge's obligation to inquire into the lack of competency may be triggered by either the defendant's mental health history or his conduct in the courtroom.

Gregg extends his criticism to the District Court for not acknowledging the State's burden of proof to establish compe-

tency beyond a reasonable doubt and concomitantly criticizes the Circuit Court for relying on the District Court finding of his competency without conducting a new competency hearing. Petitioner contends that his behavior at trial should have engaged the trial judge's *sua sponte* duty to examine Gregg's competency to stand trial.

For example, Gregg characterizes as "bizarre" his dialogue with the trial judge about why he could not stand for long while addressing the court. He suggests that this dialogue should have been viewed as an indication to the trial judge of Gregg's possible incompetence to stand trial:

COURT: Okay, wait one second. Yes, sir, you may stand sir.

GREGG: Standing is a problem for me.

COURT: Are you able to stand?

GREGG: Not for long.

COURT: Well, let's do the best you can, let's see if you can stand.

GREGG: I stood when you—okay, I'll stand for a moment.

COURT: Yeah, see if you can't stand. Are you John Leon Gregg?

GREGG: Yes, sir, I am.

COURT: Okay, you can stand anymore?

GREGG: I can, but then I won't be able to stand later.

COURT: Well, I would like you to stand now, let's see if you can do that.

GREGG: Can we get the handcuffs in front?

COURT: I tell you what, you can take them off of him.

GREGG: Thank you, Your Honor.

COURT: You just stand and then we're going to talk turkey here. (Pause). What—does it hurt you?

GREGG: The handcuffs?

COURT: Yeah.

GREGG: The last time I was here it got to be too long.

COURT: Was it too long? All right, sir, you want to-you want to stand now? Can you stand up now?

GREGG: Not for long, I need—

COURT: Well, do the best you can.

GREGG: But then I won't be able to stand to leave your court, Your Honor.

COURT: That's all right. I'll let you stand when you want to leave. Let me ask you a question, sir.

GREGG: Yes, sir?

COURT: Stand, remain standing, sir.

GREGG: I'd rather not.

COURT: I know, but that's the way we run this court. That's the way we run it. You address the Court, you stand, everybody does, you follow me?

GREGG: Yes, I'd rather—I'll stand briefly when I begin.

COURT: I know that's not what you would rather do, that's the procedure here.

GREGG: Well, I have a problem with procedure.

COURT: Well, it's too bad, that's the procedure here. Do you want to obey the Court order?

GREGG: I have an orthopedic restriction on walking.

COURT: Well, you're not walking, all I want you to do is stand.

GREGG: So you just want me to stand until my ankles collapse and then I can sit?

COURT: Yeah, until they collapse, you want to stand. I'm only going to be a couple of minutes, just a couple of minutes.

GREGG: Well, I have a—since I didn't know I had trial today I did my maximum walking at three this morning, so I would just as soon not do all this standing.

COURT: Okay, well I want you to stand right now.

GREGG: I guess I don't want to stand, Your Honor.

COURT: You don't want to stand? Take him back and we're not going to fool with him.

GREGG: Thank you, Your Honor.

Gregg urges us, in light of his "bizarre" behavior at trial, to find that it was "entirely inappropriate for the trial court to rely on a different court's competency determination made almost two months before trial." Code § 3–104, argues Gregg, imposes a continuing duty on the ultimate trial court to assess a criminal defendant's competency to stand trial. Petitioner argues that, given his *pro se* status, when the prosecutor mentioned the earlier competency hearing in the District Court, the trial judge, at a bare minimum, should have secured a copy of and reviewed the Crownsville report and conducted a new inquiry.

Petitioner's next bundle of arguments center around his contention that he was not competent to waive his right to counsel and that the trial judge erred by not so finding. Gregg argues that the standard by which a court is to assess competency to stand trial and competency to waive counsel are not necessarily the same in every case or even at different times in the same case. *See Snead v. State*, 286 Md. 122, 129 n. 5, 406 A.2d 98, 102 n. 5 (1976); *State v. Renshaw*, 276 Md. 259, 267 n. 3, 347 A.2d 219, 225 n. 3 (1975). Petitioner advocates that we should adopt a higher standard for assessing competency to waive counsel than that required by the federal Constitution's Due Process Clause. Gregg desires a standard that includes consideration of both decisional and functional elements relating both to a defendant's capacity to waive counsel and to represent himself—the inquiry should be broadened to include assessment of whether a defendant has the mental capacity to proceed in making his defense without a lawyer. *See* J.W. Corinis, *A Reasoned Standard for Competency to Waive Counsel After* Godinez v. Moran, 80 Boston U.L.Rev. 265 (2000). At oral argument before this Court, Petitioner conceded that such a review would not be appropriate for *all* defendants seeking to waive counsel, but only for those defendants whose competency to stand trial was already at issue. In this matter, Petitioner argues that because his competence to stand trial was at issue in the District Court and because it *should* have been an issue in the circuit court, a

higher standard needed to be satisfied before the circuit court concluded he had waived counsel.

Petitioner lastly complains that neither the District Court nor the Circuit Court complied with the requirements of Rule 4–215 and the Court of Special Appeals erred in concluding that piecemeal compliance in the course of the two circuit court hearings satisfied the full dictates of the rule. Even if the intermediate appellate court correctly found that piecemeal compliance satisfies Rule 4–215, Gregg asserts that the combined advisements sanctioned by the Court of Special Appeals were deficient nonetheless. Petitioner contends that at no time during the course of either the District Court proceedings or Circuit Court hearings was he advised as required by section (a)(5), that if he appeared for trial without counsel he could be deemed to have waived counsel. Gregg also disputes the Court of Special Appeals's view of *Johnson v. State*, 355 Md. at 461, 735 A.2d at 1025, which forbade piecemeal compliance by the concerted actions of district and circuit courts in a case. Petitioner reads *Johnson* as mandating that "the subsection (a) advisements [] be given in strict accordance with Md. Rule 4–215, by the correct court and not piecemeal." *Id.* Petitioner concludes that, in violation of the dictates of Rule 4–215, the advisements were never given by any one judge.

### B.

Respondent retorts that there was no basis for the Circuit Court to reconsider Gregg's competency and therefore the Court of Special Appeals properly determined that the Circuit Court did not abuse its discretion by not conducting a new, *sua sponte* competency hearing. The State asserts that where a defendant is adjudged competent after a thorough pre-trial hearing, even if in a different tier of the court system than in the one he or she is tried ultimately, the decision to reconsider competency lies within the sound discretion of the ultimate trial court.

The State contends that the proceedings in the present case comported with the standards outlined by § 3–104 and explained further by this Court in *Roberts*. In *Roberts*, we explained the predecessor to § 3–104 [4] as follows:

> The language of [the predecessor statute] mandates actions to be undertaken by a trial court, if an accused's competency is properly called into question. These actions can be broken down into three distinct simple steps: (1) First, a determination of competency may be made at any time before or during trial; (2) Second, such a determination must be made if the defendant in a criminal case appears to be incompetent to stand trial or the defendant alleges incompetence to stand trial; and (3) Finally, the court must make its determination on the evidence presented in the record.

361 Md. at 364, 761 A.2d at 895. Respondent finds the requirements elucidated in *Roberts* to have been satisfied in the proceedings below. Gregg's competency determination was made by the District Court after a full hearing and he did not challenge the competency determination made by the District Court on appeal to the Court of Special Appeals. The State argues that the record indicates that the District Court concluded that Gregg was competent beyond a reasonable doubt because he understood the nature and the object of the proceedings against him and was capable of assisting in his defense. Respondent dismisses Gregg's assertion that "it was entirely inappropriate for the circuit court to rely on a different court's competency determination made almost two months before trial," and states that the statute was satisfied because the District Court made a competency determination on the record as soon as Gregg's competency was called into question. The Circuit Court therefore had no reason to reconsider Gregg's competency because he did not request

---

4. Maryland Code (1982, 2000 Repl.Vol.), Health–General Article § 12–103 was recodified as Maryland Code (2001), Criminal Procedure Article, § 3–104 without change.

another determination and because he demonstrated that he was competent throughout the proceedings.

The State further proffers that had there been no prior competency determination in this case, it would not have been an abuse of discretion for the Circuit Court not to hold competency hearings *sua sponte.* Respondent analogizes the present matter to *Thanos v. State.* In that case, in support of his contention that the trial court had a *sua sponte* obligation to inquire into his competency, Thanos cited various instances of strange behavior: (1) his "unusual request to absent himself from the trial" and his announcement that he would be disruptive during the proceedings; (2) his "whimsical" decision to waive his right to a jury for trial and sentencing, and his decision to not absent himself from the proceedings; (3) "several strange remarks he made to the trial judge"; and, (4) "his general history of mental illness, borderline personality disorder, and self-destructive tendencies." 330 Md. at 85, 622 A.2d at 731. We found that Thanos met the two-pronged test for competency to stand trial and observed,

> While Thanos did make some peculiar remarks to the trial judge, his words on the whole were very lucid. He appeared to grasp all of his rights as they arose throughout the proceedings. He explained very clearly why he preferred conditions in the Super Max facility in Baltimore to those of the St. Mary's County Detention Center. And he understood and insightfully articulated his tendency to become disruptive under stress, which reasonably justified his initial desire to absent himself from the proceedings.

*Id.* The State suggests that, like Thanos, Gregg displayed at worst "mere eccentricities" at the hearings and at trial, but, also like Thanos, those "eccentricities did not prevent him from understanding the proceedings or presenting his own defense." Gregg exhibited a complete recollection of the relevant events and appropriately conducted himself before the court and the jury.

Respondent also challenges Petitioner's reliance on *Drope v. Missouri* and *Pate v. Robinson.* In each of those cases, the

United States Supreme Court condemned the failure of the state trial courts to hold any competency hearings in light of significant evidence of the respective defendants' potential incompetence. In the present matter, a determination with regard to Gregg's competency was made after a relatively thorough pre-trial hearing in the District Court. There was no indication that his circumstances had changed since that competency determination had been made. For these reasons, the State concludes, the Court of Special Appeals correctly concluded that the Circuit Court did not err in not conducting further *sua sponte* competency hearings and by perhaps implicitly relying on the competency determination made by the District Court.

The State continues its riposte by asserting that the argument that a defendant's competency to waive counsel should be judged by a higher standard than a defendant's competency to stand trial was not preserved for review as it was not raised in the trial court or in the Court of Special Appeals. In the alternative, Respondent asks us to find that Gregg's contention also fails on the merits. The waiver inquiry required by Rule 4–215 must demonstrate sufficiently that "defendant is competent to waive the right to counsel, and that he knowingly and intelligently has done so after being made aware of the advantages and disadvantages of self-representation." *Renshaw*, 276 Md. at 267, 347 A.2d at 225. The State notes that the criminal defendant in *Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), also argued that the competency standard for waiving counsel must be higher that the standard for standing trial "because a defendant who represents himself 'must have greater powers of comprehension, judgment, and reason than would be necessary to stand trial with the aid of an attorney.'" 509 U.S. at 399, 113 S.Ct. at 2686, 125 L.Ed.2d at 332. The Supreme Court was unpersuaded by this argument, reasoning:

But this argument has a flawed premise; the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself. In *Faretta v. Califor-*

*nia*[422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)] we held that a defendant choosing self-representation must do so "competently and intelligently," and we emphasized that although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored." Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* representation.

509 U.S. at 399–400, 113 S.Ct. at 2686–87, 125 L.Ed.2d at 332–33 (internal citations omitted). The State claims that we adopted the Supreme Court's reasoning in our decision in *Thanos* and concludes that consideration and acceptance of Gregg's waiver of counsel was conducted pursuant to the standard outlined in *Godinez* and *Thanos*.

The State finally argues that the Court of Special Appeals properly held that Gregg was fully advised under Maryland Rule 4–215 before being permitted to waive his right to counsel. The trial court examined Gregg and made certain that his decision to waive counsel was knowing and voluntary. The court informed Gregg that he was charged with second degree assault and that the maximum penalty was ten years in prison. The court explained to Gregg that if he could not afford a lawyer, he would be provided with one and told him that a lawyer would be helpful in presenting his case to the jury. Gregg nonetheless insisted that he wanted to represent himself. Regarding Gregg's assertion that the trial court erred in not advising him, pursuant to section (a)(5), that if he appeared for trial without counsel the court could determine that he waived counsel and he could go to trial unrepresented by counsel, Respondent contends that because Gregg was being tried the same day the waiver was accepted, section (a)(5) was not applicable. Furthermore, Gregg was given a copy of the charging document on 5 December 2001, in compliance with section (a)(1) of the Rule.

## IV.

A competency hearing and determination must meet the due process requirements under the Fourteenth Amendment to the United States Constitution[5] and Article 21 of the Maryland Declaration of Rights.[6] *See Medina*, 505 U.S. at 439, 112 S.Ct. at 2574, 120 L.Ed.2d at 359 (stating that "it is well established that the Due Process Clause of the Fourteenth Amendment [to the United States Constitution] prohibits the criminal prosecution of a defendant who is not competent to stand trial"); *Drope*, 420 U.S. at 171, 95 S.Ct. at 903, 43 L.Ed.2d at 113 (noting the long-standing belief that a person who lacks the capacity to understand the nature and object of the proceedings against him may not stand trial); *Pate*, 383 U.S. at 378, 86 S.Ct. at 838, 15 L.Ed.2d at 818 (concluding that "the conviction of an accused person while he is legally incompetent violates due process"); *Trimble v. State*, 321 Md. 248, 254, 582 A.2d 794, 797 (1990) (stating that "[i]f a state fails to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent, it denies him due process"); *Jones v. State*, 280 Md. 282, 290, 372 A.2d 1064, 1068 (1977) (finding that the failure to invoke proper statutory

---

**5.** Section 1 of the Fourteenth Amendment to the United States Constitution reads as follows:

   All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**6.** Article 21 provides:

   That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defense; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

procedures designed to insure that the defendant not be tried if incompetent may result in the denial of a fair trial).

To ensure that the requirements of due process are satisfied, the Legislature enacted § 3–104 mandating that once competency properly is made an issue, before or during trial, the court must determine, on evidence presented on the record, whether the criminal defendant is competent to stand trial. *Roberts*, 361 Md. at 356, 761 A.2d at 891. The Court of Special Appeals has observed that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Hill v. State*, 35 Md.App. 98, 108, 369 A.2d 98, 104 (1977) (quoting *Drope*, 420 U.S. at 181–82, 95 S.Ct. at 908, 43 L.Ed.2d at 118).

■ As iterated by the parties in their arguments, a criminal defendant's competency to stand trial may be made an issue when the defendant or defense counsel alleges that the defendant is incompetent to stand trial or when the defendant "appears to the court" potentially to be incompetent. § 3–104. A criminal defendant is presumed to be competent until it is alleged that he or she is incompetent to stand trial. Once an allegation of incompetence is made, however, the defendant's competence to stand trial then must be determined based on evidence meeting the beyond a reasonable doubt standard. *Roberts*, 361 Md. at 368, 761 A.2d at 897. Maryland Code (2001), Criminal Procedure Article, § 3–101 defines "incompetent to stand trial" to mean "not able (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." We stated in *Raithel v. State* that an accused must have "a rational as well as factual understanding of the proceedings against him," and "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." 280 Md. at 300, 372 A.2d at 1074 (quoting *Dusky*, 362 U.S. at 402, 80 S.Ct. at 789, 4 L.Ed.2d at 825).

In *Roberts v. State*, defense counsel filed with the circuit court a motion requesting a mental examination of the defen-

dant, which motion was denied without a hearing. 361 Md. at 356, 761 A.2d at 890. This Court held that the trial court erred in not holding a hearing to provide an opportunity for the defendant to present evidence whether to refer her for a competency evaluation to be used in making a competency determination. 361 Md. at 356, 761 A.2d at 891. We reasoned that when competence is put in question a trial court is required to make a competency determination based on the evidence on the record, and although a formal hearing is not required in all circumstances, where the allegation of incompetency is unsupported by any evidence on the record to that time, the accused must be given an opportunity to present evidence upon which a determination may be made. *Id.* We observed in *Roberts* that the language of the statute "indicates that the Legislature intended for every accused, whose competency was called into question, to have at least one guaranteed review of his or her competency status." 361 Md. at 365–66, 761 A.2d at 896.

Thus, it is clear that § 3–104 requires a competency determination to be made based on the evidence on the record when the competence of a criminal defendant is called into question by the defendant or defense counsel. What is less clear is what circumstances require a court to exercise *sua sponte* it's duty to evaluate a defendant's competency.

In *Johnson v. State,* 67 Md.App. 347, 507 A.2d 1134 (1986), the Court of Special Appeals addressed whether the trial court erred by not conducting a *sua sponte* competency hearing when neither the accused nor his counsel raised the issue at trial. Johnson was determined by the court to be competent to stand trial before his first trial commenced. 67 Md.App. at 353, 507 A.2d at 1137. The first trial resulted in a mistrial after the defendant repeatedly interrupted the trial and was evaluated to be incompetent to stand trial. Johnson was allowed to enter a plea of guilty by reason of insanity. 67 Md.App. at 354, 507 A.2d at 1138. At no time before or during Johnson's second trial was the competency issue raised by the defendant or by defense counsel. 67 Md.App. at 359, 507 A.2d at 1140. The Court of Special Appeals concluded

that the record indicated no basis requiring the judge in the second trial to conduct a *sua sponte* evidentiary hearing to determine Johnson's competency to stand trial. 67 Md.App. at 360, 507 A.2d at 1141. The intermediate appellate court noted that Johnson stated that he was not mentally ill; his counsel told the court he thought Johnson was competent to stand trial; he answered all of the judge's questions in a rational and coherent manner; he "displayed a marked degree of sophistication about the law"; and "there is every indication in the record that appellant met the standard of competency to stand trial." 67 Md.App. at 359–60, 507 A.2d at 1140–41.

We addressed a court's *sua sponte* duty to consider a defendant's competency to stand trial in *Thanos v. State*. At no point prior to or during his trial did Thanos or his counsel move the court to consider defendant's competency to stand trial. On appeal, however, Thanos asserted that the trial court committed reversible error by not inquiring into his competency to stand trial. 330 Md. at 83, 622 A.2d at 730. He referred to several instances of his behavior at trial which he claimed should have suggested his incompetence to the court. *See supra* at 534. We concluded, however, that the trial court did not have a *sua sponte* obligation to conduct a competency hearing on the facts of that case. 330 Md. at 86, 622 A.2d at 731. We reached our conclusion based on the facts that Thanos opposed the State's request at trial to evaluate his competency to stand trial[7]; none of his defense attorneys subsequently alleged that he was incompetent despite their explicit assertion that "Defendant now has counsel who can keep the Court appraised should a competency issue arise in the future"; none of Thanos's four expert witnesses at sen-

---

**7.** Thanos opposed the request, stating:

the State's petition must be dismissed because neither the Defendant nor his counsel has alleged the Defendant is incompetent and in the Defendants [sic] prior Court appearance, the Court did not indicate that the Defendant appeared incompetent. Therefore the Court would not have any authority to conduct a competency hearing at this time.

330 Md. at 86, 622 A.2d at 731.

tencing ever suggested that he was incompetent; and the record of the trial proceedings indicated that Thanos "exhibited both 'present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him.'" 330 Md. at 86–87, 622 A.2d at 731–32 (quoting *Dusky*, 362 U.S. at 402, 80 S.Ct. at 789, 4 L.Ed.2d at 825).

We also considered the type of behavior that might trigger a trial court's *sua sponte* obligation to determine a defendant's competency to stand trial in *Ware v. State*, 360 Md. 650, 759 A.2d 764 (2000). Similar to the facts of *Thanos*, Ware's competency was never raised by the defense before the trial court and, when questioned by the court, defense counsel explicitly stated that he was not suggesting that Ware was incompetent. 360 Md. at 705, 759 A.2d at 793. Ware contended on appeal, however, that his "eleventh hour" decision electing a jury sentencing, despite counsel's advice to the contrary, should have triggered the court's obligation to conduct a competency examination. 360 Md. at 704, 759 A.2d at 792. We explained that the trial court did not err in failing to conduct, *sua sponte*, a competency evaluation because there was "nothing in the record to indicate that Appellant lacked the present ability to consult with his attorneys with a reasonable degree of rational understanding or factual understanding of the proceedings." 360 Md. at 705–06, 759 A.2d at 793. We found that the sudden shift in trial strategy was not a sufficient demonstration to trigger a competency evaluation. *Id.*

## V.

### A.

We first consider whether the circuit court was required to evaluate Gregg's competency *sua sponte*. We evaluate what was before the trial judge to determine whether the trial judge's failure to make further inquiry into Petitioner's competence to stand trial was error.

Gregg criticizes the Circuit Court for relying on the District Court's determination that he was competent to stand trial

and contends that, instead, the Circuit Court was required to conduct its own evaluation. The underpinnings of Gregg's argument are unsupported. First, it does not appear from the record that the Circuit Court simply relied on the District Court's finding of competency and, second, there is nothing in the record that reasonably may be interpreted as a clear indicium of potential incompetence sufficient to trigger the trial judge's *sua sponte* duty to evaluate defendant's competency to stand trial in the Circuit Court.

■ When a criminal defendant prior to trial in the District Court requests a jury trial, the District Court is divested of its jurisdiction and jurisdiction is then conferred on the circuit court. Maryland Code (1973, 2002 Repl.Vol.), Courts & Judicial Proceedings, § 4–302(e).[8] On 4 December 2001, after making his prayer for jury trial, Gregg was served with a Notice to Appear in Circuit Court the following day, pursuant to Md. Rule 4–301(b)(2).[9] The District Court proceedings conducted to that point were not binding on the circuit court. When a case is removed to the circuit court, the proceeding begins anew and generally the rulings of the District Court on pre-trial matters are not preclusive or binding. Section 3–104 places a burden on the "court" to determine whether the

---

**8.** Section 4–302(e) provides that "[t]he District Court is deprived of jurisdiction if a defendant is entitled to and demands a jury trial at any time prior to trial in the District Court."

**9.** Md. Rule 4–301(b)(2) provides:

Procedure following demand. Upon a demand by the defendant for jury trial that deprives the District Court of jurisdiction pursuant to law, the clerk may serve a circuit court summons on the defendant requiring an appearance in the circuit court at a specified date and time. The clerk shall promptly transmit the case file to the clerk of the circuit court, who shall then file the charging document and, if the defendant was not served a circuit court summons by the clerk of the District Court, notify the defendant to appear before the circuit court. The circuit court shall proceed in accordance with Rule 4–213(c) as if the appearance were by reason of execution of a warrant. Thereafter, except for the requirements of Code, Criminal Procedure Article, § 6–103 and Rule 4–271(a), or unless the circuit court orders otherwise, pretrial procedures shall be governed by the rules in this Title applicable in the District Court.

defendant is incompetent to stand trial. The "court" is defined as "a court that has criminal jurisdiction." Maryland Code (2001), Criminal Procedure Article, § 3–101(c). While it had jurisdiction in the present matter, the District Court considered and ruled on Gregg's competency as it appeared to that court. When the Circuit Court obtained jurisdiction over Gregg it was not bound by the prior determination of competency made by the District Court and the proceedings properly began anew without any competency determination on the Circuit Court record. *See Johnson,* 355 Md. at 457, 735 A.2d at 1023 (noting that the circuit court has exclusive original jurisdiction). The mere facts that (1) there was a competency evaluation in the District Court resulting in a finding of competency, and (2) there may exist a report generated in the District Court proceeding assessing Gregg's competency are not alone sufficient indicia of incompetency to trigger the Circuit Court's *sua sponte* duty to make a new competence determination. The Circuit Court below never ruled on the issue of competency because that issue was not properly before the court.

In the Circuit Court, the only references to Gregg's competency to stand trial and to the District Court finding of competency are found in a brief dialogue between the prosecutor, Gregg, and the judge as follows:

STATE: Your Honor, before we get started on this matter, and if I can call the case, the matter of State versus John Gregg, K–2001–2434, Kimberly DiPietro, on behalf of the State. There was a request back when this case was in District Court for a competency evaluation.

What I have in my file is a letter dated September 8, 2001 which indicates that they attempted to examine him for competency and that letter dated September 8 requested a 30–day extension to enable Crownsville to complete their evaluation. I don't have any subsequent report and I don't know if the Court file has it either. Just in looking through this file, I thought this was the competency evaluation, but it appears it is not. It was just their letter requesting some additional time to complete it.

COURT: Well, there was a hearing before Judge Hackner November 19. Sir, was there a competency hearing in the District Court?

GREGG: Yes.

COURT: What did they find?

GREGG: Competent.

COURT: Found you competent? It says here, hearing on competency before Judge Hackner and, let me see, there was a trial hearing notice, all parties—hearing on competency on November 19.[10]

GREGG: Your Honor?

COURT: Yes, sir.

GREGG: I was in Crownsville for 66 days ending November 20.

COURT: And what was the result?

GREGG: I don't know, but they had 66 days to evaluate me with pretty good consideration from me.

COURT: Then he got sent back, so let's see, after evidentiary hearing, Defendant is found competent, set for trial, and it is signed—I don't know who signed it, I guess it's Judge Hackner.

STATE: Okay, thank you very much for clarifying that.

■ It is clear from the transcript that the judge, Gregg, and the prosecutor reviewed very fundamentally what had occurred in the District Court without putting the issue of Gregg's competency properly before the Circuit Court. They discussed that Gregg's competency had been called into question in the District Court; that he had been evaluated at Crownsville; and that the District Court judge had determined him to be competent on 19 November 2001 to stand trial in that court. That discussion alone did not put Gregg's

---

10. We assume the Circuit Court judge was referring either to the CR–51 form executed in the District Court proceeding or docket entries from the District Court file for, as we noted *supra* at 523, neither the Crownsville report nor a transcript of the District Court competency hearing were part of the file before the Circuit Court.

competency to stand trial at issue in the *Circuit Court.* Because the impending trial in the Circuit Court was a proceeding separate and distinct from the proceedings in the District Court, the competency issue as it arose in the District Court was not also transferred automatically to the Circuit Court for additional or new pretrial proceedings. The defendant's competency to stand trial must be raised anew in the Circuit Court proceedings—by motion of the defendant or defense counsel, or by conduct by the defendant sufficient to trigger *sua sponte* consideration by the trial judge—in order to compel the need for a competency determination. Respondent incorrectly analyzes this as an issue of the trial judge's discretion to reconsider an initial competency determination. As the record contains no motion to evaluate Gregg's competency, the only way in which competency would be before the Circuit Court was if the defendant "appear[ed] to the court to be incompetent to stand trial."

The passages indicated by Petitioner as examples of "strange" and "erratic" behavior in the pre-trial and trial proceedings in the circuit court fall short of crossing the threshold triggering the judge's *sua sponte* duty to evaluate Gregg's competency to stand trial. The Supreme Court aptly observed in *Drope v. Missouri* that "the question [whether the evidence at trial suggests that the defendant's competence is suspect] is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." 420 U.S. at 180, 95 S.Ct. at 908, 43 L.Ed.2d at 119. The behavior indicated in this record is significantly less egregious than that found by us in other cases *not* to trigger the obligation.

The most apposite case is *Thanos v. State.* As discussed *supra,* Thanos argued on appeal to this Court that the trial court erred by not inquiring at trial into his competency to stand trial. As indicated *supra* at 534, Thanos proffered several examples of behavior at trial or indications of a troubled mental history that he suggested should have triggered the court's *sua sponte* duty to inquire into his possible incompetency. In addition to those examples, he noted he remarked to the trial judge "in dog years ... I would be like

200 and some years old," and asking whether his death sentence was "death by gas, or death by roo-roo?" 330 Md. at 85, 622 A.2d at 731. We found in that case that the defendant, despite his odd behavior, had both "present ability to consult with his lawyer with a reasonable degree of rational understanding," and "a rational as well as factual understanding of the proceedings against him." 330 Md. at 87, 622 A.2d at 731. The behavior in that case was markedly more "odd" than the pre-trial and trial behavior to which Gregg draws our attention in the circuit court in this matter.

There is nothing in the record of the circuit court proceedings in this case indicating that Gregg lacked the "sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding or factual understanding of the proceedings." *Ware,* 360 Md. at 706, 759 A.2d at 793. On the contrary, Gregg's participation at trial was rational and coherent.

■ As observed *supra,* a criminal defendant initially is presumed to be competent to stand trial. *Ware,* 360 Md. at 703, 759 A.2d at 792. That presumption may be rebutted if the defendant appears to the trial court to be incompetent, at which point the court has an obligation to determine the defendant's competency to begin trial, or if it has already commenced, to resume trial. *Id.* Gregg insists that the Circuit Court should have conducted an inquiry into his competency based on his mental health history, the Crownsville report, and his behavior at trial in the Circuit Court.

There is but a single reference in the Circuit Court record to Petitioner's "history" of mental health issues. During Gregg's 5 December 2001 appearance before the Circuit Court, the judge asked him whether he had spent time in a mental institution and Gregg responded that he had been at Crownsville for 66 days for competency evaluation and ten days at North Anne Arundel Hospital for evaluation. This is not so substantial a history of mental illness as to compel the court to inquire further into a defendant's competency.

Gregg's behavior at trial may be described as stubborn and argumentative at most. He responded appropriately to the judge's questions and his defense was in no way aberrant for a *pro se* defendant. He demonstrated both a rational understanding of the proceedings in which he was involved and of the relevant facts. Gregg's present reliance on the Supreme Court's statement in *Pate v. Robinson* that although the defendant displayed a degree of "mental awareness" in his "colloquies with the trial judge," "this reasoning offers no justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior," 383 U.S. at 385–86, 86 S.Ct. at 842, 15 L.Ed.2d at 822, is misplaced because there is no body of evidence on the record in the Circuit Court of any history of incompetency.

His behavior at sentencing may have been more suggestive of a potential problem than that at trial, but neither raised a doubt as to his ability to understand the object and nature of the proceedings or to assist in, or mount, his own defense. Furthermore, the mere mention that there was a report generated as a result of a competency evaluation in the District Court, against which the District Court concluded that Gregg nonetheless was competent to stand trial, does not call into question Gregg's competency to stand trial in the Circuit Court. Considered as a whole, there was no adequate basis in the record before the trial judge necessitating a *sua sponte* competency evaluation by him.

### B.

Because we find that Petitioner's competency was never at issue before the Circuit Court, his argument fails that there should be a heightened standard applied to the assessment of his competency to waive counsel—one which evaluates mental capability—when a defendant's general competency to stand trial is before the court. Maryland law requires that waiver of counsel be made knowingly and voluntarily, but does not require an assessment of how effectively Gregg was able to represent himself at trial. *Renshaw*, 276 Md. at 267, 347 A.2d at 225.

The Supreme Court's analysis in *Faretta* is applicable to this matter. *Faretta* was charged with grand theft and requested that he be permitted to represent himself in the Superior Court of Los Angeles County, California. 422 U.S. at 807, 95 S.Ct. at 2527, 45 L.Ed.2d at 566. The trial judge, after vacillating back and forth on the subject and after conducting a *sua sponte* hearing to inquire into Faretta's ability to represent himself,[11] ruled that a criminal defendant did not have a constitutional right to conduct his own defense and appointed the public defender to represent Faretta. 422 U.S. at 808–09, 95 S.Ct. at 2528, 45 L.Ed.2d at 567–68. The Supreme Court reasoned that the Sixth Amendment to the United States Constitution[12] grants the accused not only the right to be represented by counsel, but also the right to make his own defense *without* the assistance of counsel. 422 U.S. at 819, 95 S.Ct. at 2533, 45 L.Ed.2d at 572. The Court reiterated that an accused must "knowingly and intelligently" waive counsel in order to represent himself, and stated that "a defendant need not have the skill and experience of a lawyer in order competently to choose self-representation." 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581. The Supreme Court disagreed with the trial court's ruling that Faretta had not demonstrated sufficient knowledge of the law to represent himself and found that "how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire*" was "not relevant to an assessment of his knowing exercise of the right to defend himself." 422 U.S. at 835–36, 95 S.Ct. at 2541, 45 L.Ed.2d at 582.

---

**11.** At that hearing, Faretta answered numerous questions posed to him by the trial judge regarding his knowledge of criminal procedure, evidence, and jury *voir dire*. Faretta answered these questions, demonstrating a high level of understanding regarding criminal law and courtroom procedures.

**12.** The Sixth Amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense."

Although the Supreme Court has found that the states are free to adopt a higher standard for assessing competency to waive counsel than required by the federal Due Process Clause, *Godinez,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321, Maryland has not done so and Petitioner presents no compelling reason to increase the protections provided by Rule 4–215.

### C.

We conclude that the Circuit Court properly advised Petitioner of his right to counsel. The initial proceedings in the Circuit Court relating to Gregg's waiver of counsel occurred on 5 December 2001:

COURT: You have a constitutional right to have an attorney. If you cannot afford an attorney, the Public Defender will represent you at no cost to you. Did you receive a copy of the charging document?

GREGG: Yes.

COURT: Do you understand the maximum penalty that you face?

GREGG: Yes. Ten years or a bunch of money.

COURT: $2,500. Do you want an attorney? Do you want to represent yourself?

GREGG: I'm not going to pay the Public Defender, so I better represent myself. My case—

COURT: You don't have to pay a Public Defender.

GREGG: My case is straightforward.

COURT: Wait a minute. Who told you you had to pay the Public Defender?

GREGG: The paperwork says if you can afford it, there could be charges. I will just represent myself. My case is straightforward.

COURT: I understand but some people who represent themselves end up going to jail. I just want to make sure you know that you have the right.

Let me explain something. An attorney can help you by explaining the charges and the penalties. Can help you at trial. Can help you protect your constitutional rights. Can help you obtain a fair penalty if you are convicted.

Even if you were planning to plead guilty to this case, a lawyer could still help you. If you want a lawyer and can't afford to hire one, the Public Defender will represent you at no cost to you. Do you understand?

GREGG: Well, it is not clear to me that the Public Defender—to be free. But I am going to—

COURT: Well, I am telling you, it will be, if you qualify.

GREGG: I—. If I qualify, that is a big if. I spoke to the Public Defender—me and he gave me a couple of brief ideas about how it could go. So, I am willing to go by myself.

COURT: Very well. How old are you?

GREGG: 53.

COURT: How far did you go in school?

GREGG: Masters of Electrical Engineering.

COURT: Are you under the influence now of any alcohol, drugs, medications or pills?

GREGG: Not to speak of.

COURT: What does that mean?

GREGG: There is a slight drugging of my food in jail, but it is not relevant.

COURT: Yes, but does that medication, drugs, whatever it is, will that affect your ability to understand what you are doing?

GREGG: Oh, no.

. . . .

COURT: All right, Mr. Gregg, you have a constitutional right to have a trial by jury. A jury would consist of 12 people, residents of this County, who are licensed to drive or registered to vote, 18 years of age or older.

And you would be able to help in selecting 12 people to sit and judge you in this case. Of course, if you don't want a jury trial, you can have a court trial. But if you elect a jury

trial, all 12 jurors would have to agree that you were guilty before you could be found guilty.

Of course all 12 would have to agree that you are not guilty for your [sic] also to be found not guilty. Do you understand that?

GREGG: Yes, I agree—I want the jury trial. I am not looking forward to the jury selection. I am just going to leave that to the prosecutor and you.

COURT: No, that is not the system. You have a right to participate in that system.

GREGG: Well, okay.

COURT: That is why, many times it is better to have a lawyer to help work with you and explain to you and give you advice on how to go through that process.

GREGG: I seen a trial—.

COURT: Well, yes. I have people coming in here telling me that Judge Judy is what a trial is all about. And that is just entertainment. That is not a trial. That is to keep people happy and interested in watching TV.

GREGG: I admit jury selection will be difficult.

COURT: I am going to recommend that you get an attorney. I think it would be better. I want you coming in here with a level playing field. I don't want the State to have an advantage over you.

I am going to refer you to the Public Defender's Office. If you decide after the consultation you don't want them, that is your decision, but I think you need to at least talk to them.

GREGG: I have already decided against a Public Defender.

COURT: Well, they can even panel the case to a private attorney. The other option you have is the Anne Arundel County Bar Association. They have a process of referring you to a lawyer in the Anne Arundel County Bar Association who will take the case at a reduced fee. Do you understand that?

GREGG: Yes. My first choice [sic] to handle it myself. The second choice would be Public Defender. But I can do this by myself. They jury selection will be my problem.

COURT: Are you sure you want a jury?

GREGG: Yes.

When Gregg returned to court for trial, the counsel waiver proceedings continued as follows:

COURT: You don't have a lawyer?

GREGG: Too cheap.

COURT: You're too cheap?

GREGG: Yes.

COURT: You want to represent yourself?

GREGG: Yes, sir.

COURT: And you know that a lawyer could help you?

GREGG: He could charge me, too.

COURT: And if you can't afford a lawyer, you can get a public defender, did you know that?

GREGG: Yeah, but the paperwork says that there can be a charge for the public defender. I think I—

COURT: You think you could do better by yourself?

GREGG: Yes, sir.

COURT: And you read and write?

GREGG: Oh yes.

COURT: And you understand you are charged with a second degree assault?

GREGG: Yes, sir.

COURT: And you understand the maximum penalty is ten years in jail?

GREGG: I'm claiming I'm not guilty.

COURT: I understand, but do you understand that is the maximum penalty?

GREGG: Yes sir, I understand that.

COURT: Okay, and you understand if you can't afford a lawyer that the right to counsel includes the right to—a lawyer if you can't afford one?

GREGG: I can afford one, I just don't want to.

COURT: And you understand if you plead guilty—or you are not going to plead guilty?

GREGG: Oh, no.

COURT: Okay, and you understand you have a right to call witnesses on your behalf, the right to confront and cross examine the witnesses the right to compel witnesses to appear in court and testify and the right to require proof of the charges beyond a reasonable doubt?

GREGG: Yes, sir.

COURT: And are you now under the influence of any alcoholic beverage?

GREGG: No, sir.

COURT: Are you aware of any mental condition or physical disability which prevents you from understanding what you are doing now?

GREGG: Just the walking restriction is all.

COURT: You got a walking restriction, and are you making this decision to proceed without a lawyer freely and voluntarily?

GREGG: Because I'm too cheap, yes.

COURT: All right, the Court finds that you have knowingly, intelligently, and voluntarily and affirmatively waived your right to counsel and you may be permitted to proceed without the assistance of counsel.

Petitioner argues that a finding here that he was advised properly of his right to counsel, such that the subsequent waiver of counsel was valid, would violate the holding in *Johnson v. State.* He posits that *Johnson* stands for the proposition that "advice of rights from a District Court judge" does not satisfy the advisements requirement of Rule 4–215, 355 Md. at 456, 735 A.2d at 1023, and that the only way we could conclude that he properly received his advice of rights is

if we combine advisements from his District Court hearing and his circuit courts appearances. Because *Johnson* would not countenance such a patchwork of advisements, Gregg argues that he was not properly advised of his rights pursuant to Rule 4–215. There is no need to decide whether the combined District Court advisements and the circuit court advisements were sufficient to satisfy Rule 4–215 because the Circuit Court fully advised Petitioner of his rights under 4–215.

■ We observed in *Johnson* that the trial court must comply with Rule 4–215 in order for defendant's waiver of counsel to be effective, 355 Md. at 444, 735 A.2d at 1016. We further stated,

> Maryland Rule 4–215 exists as a safeguard to the constitutional right to counsel, providing a precise "checklist" that a judge must complete before a defendant's waiver can be considered valid; as such, it mandates strict compliance.

355 Md. at 426, 735 A.2d at 1006. Compliance requires that the criminal defendant receive his or her advisements from a circuit court judge because the circuit court has exclusive original jurisdiction, or from the district court when a defendant appears there without counsel and demands a jury trial. 355 Md. at 457, 735 A.2d at 1023.

■ The record indicates that the Circuit Court complied with all parts of Rule 4–215(a) except for part (5). Part (5) stipulates that "*[i]f trial is to be conducted on a subsequent date,* advise the defendant that if the defendant appears for trial without counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel." (Emphasis added). Gregg was found effectively to have waived his right to counsel on the same day that he was tried, thereby eliminating the need for the part (5) advisement. Because Petitioner received from a circuit court judge each and every on-the-record advisement required by Rule 4–215, he effectively waived counsel and is not entitled to a new trial.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.*

*COSTS TO BE PAID BY PETITIONER.*

BELL, C.J. and ELDRIDGE, J., dissent.

BELL, Chief Judge, dissenting.

"It is well established that the Due Process Clause of the Fourteenth Amendment [to the United States Constitution] prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353, 359 (1992), citing *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103, 112–13 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."); *see Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836–838, 15 L.Ed.2d 815, 818 (1966). *See also Roberts v. State*, 361 Md. 346, 359, 761 A.2d 885, 892 (2000). "[F]undamental to an adversary system of justice" is the way that the Supreme Court has characterized the right of a criminal defendant to be tried only if competent. *Drope*, 420 U.S. at 172, 95 S.Ct. at 904, 43 L.Ed.2d at 113. Indeed, it has been said that "[t]he right to be tried while competent is the foundational right for the effective exercise of a defendant's other rights in a criminal trial." *Medina*, 505 U.S. at 457, 112 S.Ct. at 2583, 120 L.Ed.2d at 371 (Blackman, J. dissenting).

In Maryland, a defendant is incompetent to stand trial if that defendant is unable "to understand the nature or object of the proceeding" or "to assist in one's defense." Maryland Code (2001) § 3–101(f) of the Criminal Procedure Articles.[1]

---

1. Maryland Code (2001) § 3–101(f) of the Criminal Procedure Code provides:

    "(f) Incompetent to stand trial. "Incompetent to stand trial" means not able:

The responsibility for ensuring that the prohibition against trying a defendant who is incompetent is placed on the trial court. See § 3–104. That section provides:

"a) In general.—If, before or during a trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.

"(b) Court action if defendant found competent.—If, after receiving evidence, the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practicable or, if already begun, shall continue.

"(c) Reconsideration.—At any time during the trial and before verdict, the court may reconsider the question of whether the defendant is incompetent to stand trial."

It is the trial court's responsibility to notice indications that the defendant is incompetent to stand trial and when it notices those indications, or either the defendant or his counsel so alleges,[2] to make the competence determination on the record and on the basis of the evidence presented. To this point we, the majority and I, are not in disagreement.

Our disagreement concerns whether, on this record, the trial court should have, *sua sponte,* conducted an inquiry into the competence of John Leon Gregg, the petitioner, to stand trial. In other words, it is whether the record reflected a

---

"(1) to understand the nature or object of the proceeding; or
"(2) to assist in one's defense."
Unless otherwise noted, all references are to the Criminal Procedure Article, Maryland Code (2001).

**2.** In *Thanos v. State,* 330 Md. 77, 85, 622 A.2d 727, 730, citing *Johnson v. State,* 67 Md.App. 347, 358–359, 507 A.2d 1134, 1140 (1986), this Court construed Maryland Code (1982, 1990 Repl.Vol., 1992 Cum. Supp.) § 12–103(a) of the Health General Article, the predecessor to § 3–104, as triggering the court's duty to make a competency determination in three ways: "(1) upon an allegation by the accused himself that he is incompetent; (2) upon an allegation of the defense counsel that the accused is incompetent; or (3) upon the court's *sua sponte* decision that the accused appears to be incompetent."

sufficient basis for a "bona fide doubt," *Pate, supra,* 383 U.S. at 385, 86 S.Ct. at 842, 15 L.Ed.2d at 822, as to that issue. In my opinion, there is plenty in the record to support an inquiry into the petitioner's competency, namely: his history of mental illness; the finding of incompetence by the staff at Crownsville Hospital Center ("Crownsville"), where the petitioner had been sent for just such an evaluation;[3] the petitioner's conduct during his two appearances in the Circuit Court; the information from the victim, her mother and community members detailing the petitioner's bizarre behavior and urging that the court order evaluation and treatment.

The petitioner's history of mental illness consisted, at least, of an admission to North Arundel Hospital for ten days for evaluation two years before his appearance before the Circuit Court and a sixty-six day admission to Crownsville for a competency evaluation, of both of which the petitioner informed the court. As the Supreme Court in *Pate, supra,* 383 U.S. at 385–86, 86 S.Ct. at 842, 15 L.Ed.2d at 822, pointed out, evidence of the mental alertness and understanding displayed by a defendant in "colloquies" with the trial judge "offers no justification for ignoring the uncontradicted testimony of [the defendant's] history of pronounced irrational behavior. While [the defendant's] demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." In fact, the Supreme Court has made clear "that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri,* supra, 420 U.S. at 180, 95 S.Ct. at 908, 43 L.Ed.2d at 118.

---

**3.** It is significant that, although the petitioner acknowledged being in Crownsville for a competency evaluation and that a competency report was generated as a result, the prosecutor also directed the court's attention to the existence of the competency report, thus emphasizing it, after the luncheon recess following the court's acceptance of the petitioner's present competence and waiver of counsel.

In any event, in the case *sub judice*, the court's inquiry on this issue was less than adequate, as the following colloquy on the subject demonstrates:

"COURT: ... Have you ever been a patient in a mental institution?

"[The Defendant:] Yes.

"COURT: When[?]

"[The Defendant:] Briefly at Crownsville for 66 days for competency. Two years ago, North Arundel Hospital for ten days evaluation.

"COURT: At Crownsville, did the doctors determine your competency? Did they write a report?

"[The Defendant:] Yes. I was competent when I went in.

"COURT: Did they make a report[?]

"[The Defendant:] Oh, yes.

"COURT: What did they recommend?

"[The Defendant:] I don't know.

"COURT: Oh, I see. And where are you detained now? In the Anne Arundel County Detention Center?"

Merely asking the right questions and getting an answer, particularly an incomplete one or one that is less than satisfactory, as occurred here on more than one occasion, is not enough. To be meaningful and to justify the conclusion the court draws from the answers given, that the petitioner was competent to stand trial, the inquiry must be seriously pursued and the information elicited, followed up and considered. That was not done here. Certainly, it is relevant what the Crownsville finding was and it should have been pursued more fully. It is also relevant what occurred and what was found by the staff at North Arundel Hospital, a matter that was not pursued at all.

After their evaluation of the petitioner's competence to stand trial, the staff of Crownsville Hospital Center concluded that the petitioner was not so competent, although they also acknowledged that "competency is a day-to-day issue. So, you know, on a day-to-day basis that could change." The Crowns-

ville report stated that the petitioner suffered from Delusionary Disorder, Persecutory Type, Schizoid, Avoidant and Dependent Personality Disorder, as a result of which he "does not have a rational understanding of his charges [and] appears to not have the capacity to relate to an attorney and to participate in the courtroom process with appropriate courtroom demeanor ... [he] is not able to understand the nature and object of the proceedings against him and to assist in his own defense...." In addition, it recounted some of the bizarre behavior in which the petitioner engaged while at the Hospital: crawling about on his knees, rapidly pacing the hallway, shaving his beard kneeling on the floor, yelling and cursing when redirected, being isolative, guarded and secretive. The report also indicated that the petitioner was paranoid, believing that he was videotaped, his food poisoned by the government, which also harassed him, and his house was bugged.

The petitioner's conduct when appearing before the Circuit Court was by no means the model of rationality. On his first appearance in that court, he appeared to have difficulty understanding his entitlement to public defender representation, if indigent. Moreover, it is not at all clear that the petitioner was being responsive. Note the following colloquy:

"COURT: Do you want an attorney? Do you want to represent yourself?

"[The Defendant:] I'm not going to pay the Public Defender, so I better just represent myself. My case—

"COURT: You don't have to pay a Public Defender.

"[The Defendant:] My case is straightforward.

"COURT: Wait a minute. Who told you had to pay the Public Defender?

"[The Defendant:] The paperwork says if you can afford it, there could be charges. I will just represent myself. My case is straightforward.

"COURT: ... If you want a lawyer and can't afford to hire one, the Public Defender will represent you at no cost to you. Do you understand?

"[The Defendant:] Well it is not clear to me that [the] Public Defender—to be free. But I am going to—

"COURT: Well I am telling you, it will be, if you qualify. [The Defendant:] I——. If I qualify, that is a big if. I spoke to the Public Defender——me and he gave me a couple brief ideas about how it could go. So, I am willing to go by myself."

As already indicated, the petitioner displayed a poor knowledge of the status of the competency evaluation. In fact, his responses did not seem to be directed to the questions asked, or even to acknowledge that he considered them particularly relevant: in response to the two questions concerning the Crownsville report, the petitioner answered, "yes,"adding "I was competent when I went in." And, as also already mentioned, although he acknowledged that a competency report was prepared, he professed not to know what the conclusion was, a point on which he was not pressed.

Furthermore, the petitioner confirmed, explicitly, I would suggest, one of the observations the Crownsville report made, that the petitioner displayed paranoia, believing that his food was poisoned by the government. The court inquired whether the petitioner was under the influence of alcohol, drugs, medications or pills. When the petitioner responded, "[n]ot to speak of," the court delved deeper, insisting on knowing what that meant. The petitioner stated: "There is a slight drugging of my food in jail, but it is not relevant." Strangely, there was no further follow-up by the court.

After the court advised the petitioner of the advantages of having counsel and determined to have him consult the Public Defender, the petitioner indicated that he had been refused bail.[4] This prompted the following rather curious discussion:

"COURT: Well, have you had a bail review hearing?

---

4. It is relevant that the staff at Crownsville was concerned about the petitioner's dangerousness and that most likely explains the bail decision. The information from the petitioner's neighbors, presented to the court after trial, was consistent on this point.

"[The Defendant:]   Yes.

"COURT:  When? In District Court.

"[The Defendant:]   While I was in Crownsville.   I wasn't granted bail.

"COURT:  Well, we are going to set this in for a bail review hearing.   We will do that tomorrow.

"[The Defendant:]   I probably won't pay any bail.

"COURT:  I didn't hear you.

"[The Defendant:]   I am sure that I probably won't pay any bail.

"COURT:  Well, look, if you want to be stubborn, that is all right.   There is nothing wrong with that.   It is your privilege to be stubborn.   All I am saying is I want to give you a hearing where it will be determined whether or not you get bail.   There is home detention.   There are a lot of different ways in which a person can be released without putting up money."

On the date of trial, the prosecutor informed the court that the petitioner "indicated to me ... that he intended on representing himself although he also indicated to me that he didn't know that today was his trial date.   He said he hadn't been notified about that, but since he was here he was going to go ahead and get it over with and that he wanted to proceed by way of having a jury."   This prompted the court to address the petitioner and the following rather extraordinary discussion ensued:

"COURT:  Okay, wait one second.   Yes, sir, you may stand, sir.

"[The Defendant:]   Standing is a problem for me.

"COURT:  Are you able to stand?

"[The Defendant:]   Not for long.

"COURT:  Well, let's do the best you can, let's see if you can stand.

"[The Defendant:]   I stood when you—okay, I'll stand for a moment.

**562**

"COURT: Yeah, see if you can't stand. Are you John Leon Gregg?

"[The Defendant:]  Yes, sir, I am.

"COURT: Okay, you can['t] stand anymore?

"[The Defendant:]  I can, but then I won't be able to stand later.

"COURT: Well, I would like you can stand now, let's see if you can do that.

"[The Defendant:]  Can we get the handcuffs in front?

"COURT: I tell you what, you can take them off of him.

"[The Defendant:]  Thank you, Your Honor.

"COURT: You just stand and then we are going to talk turkey here. . . .

What—does it hurt you?

"[The Defendant:]  The handcuffs?

"COURT: Yeah.

"[The Defendant:]  The last time I was here it got to be too long.

"COURT: Was it too long? All right, sir, you want to—you want to stand now? Can you stand up now?

"[The Defendant:]  Not for long.

"COURT: Well, do the best you can.

"[The Defendant:]  But then I won't be able to stand to leave your court, Your Honor.

"COURT: That's all right, I ll let you stand when you want to leave. Let me ask you a question, sir.

"[The Defendant:]  Yes. sir?

"COURT: Stand, remain standing, sir.

"[The Defendant:]  I'd rather not.

"COURT: I know, but that's the way we run the court. That's the way we run it. You address the Court, you stand, everybody does, you follow me?

"[The Defendant:]  Yes, I'd rather—I'll stand briefly when I begin—

"COURT: I know that's not what you would rather do, that's the procedure here.

"[The Defendant:] Well, I have a problem with procedure.

"COURT: Well, it's too bad, that's the procedure here. Do you want to obey the Court order?

"[The Defendant:] I have an orthopedic restriction on walking.

"COURT: Well, you're not walking, all I want you to do is stand.

"[The Defendant:] So you just want me to stand until my ankles collapse and then I can sit?

"COURT Yeah, until they collapse, you want to stand. I'm only going to be a couple of minutes, just a couple of minutes.

"[The Defendant:] Well, I have a—since I didn't know I had a trial today I did my maximum walking at three this morning, so I would just as soon not do all this standing.

"COURT Okay, well I want to stand right now.

"[The Defendant:] I guess I don't want to stand, Your Honor.

"COURT: You don't want to stand? Take him back and we're not going to fool with him.

"[The Defendant:] Thank you, Your Honor."

Following this lengthy colloquy, the court simply asked the petitioner for his election of a court or jury trial. When he elected a jury trial, the court proceeded to inquire about his educational background and waiver of counsel. Once again, as to the latter, the petitioner seemed to misunderstand that if he qualified, he would not have to pay the Public Defender. Curiously, when asked whether he was aware of any mental condition that he had or physical disability which would prevent his understanding what he was doing, the petitioner replied "Just the walking restriction is all."

Putting aside the petitioner's performance, or, more accurately, ineptitude, at trial, considerable information concerning the petitioner's bizarre behavior, over time, and more recently,

as exemplified by the very crime of which he stood accused, was presented to the trial judge. That evidence revealed a number of instances in which the petitioner displayed erratic and strange behavior, including, *inter alia*, the petitioner appearing naked at the community beach with a bag over his head, crawling through his house on his hands and knees, knocking other children, besides the victim, off their bicycles.

It is true that the petitioner appeared before two different judges in the Circuit Court and, therefore, that neither observed all of the petitioner's aberrant behavior. The trial judge, for example, was the only one to be witness to, and in reality, was an essential part of the lengthy discussion of the petitioner's ability, or lack thereof, to stand and the reasons therefor. Nevertheless, albeit the court missed, or ignored, its significance, there was a sufficient basis provided by the petitioner's behavior, at each appearance, which the court observed.

During the first appearance, the court was told of the petitioner's mental history, especially that he had been referred for a competency evaluation. Although the petitioner, apparently as well as everyone else, did not know what the report said, that referral resulted in a report being prepared and, we now know, that report determined that the petitioner was not competent. So far as the record reflects, the court did not further inquire into the Crownsville report; it certainly did not read the report, the least that one could have expected. In addition to the difficulty the petitioner displayed in understanding, or accepting, the role of the Public Defender, the petitioner stated that his food was being drugged a little, and that was the only substance whose influence he was under at that time. As indicated, the court let that comment pass without any follow-up questions at all.

The trial court, too, was aware of the petitioner's mental health history. Although the knew that he had been referred to Crownsville for a competency evaluation, it appears that the trial court had no more idea of the contents of the report that evaluation generated than did the prior judge. The latter

point was emphasized by the Assistant State's Attorney, who, before the commencement of trial, inquired of the court as to whether the evaluation was in the court file. Although the State's inquiry came subsequent to the "ability to stand" debate, it certainly gave it a context and should have served to focus the court's attention to the fact that it was, to say the least, extraordinary conduct. The record does not reflect that the trial court reviewed a copy of the Crownsville report. What it does reflect is that the trial court was satisfied with the fact that a District Court judge had held a hearing and determined that the petitioner was competent. And that was true despite the petitioner's behavior, note the "ability to stand" colloquy, on the day of trial. Moreover, while initially not informed of the petitioner's contention, made on his initial appearance in the Circuit Court, that the jail was drugging the petitioner's food, the trial court was apprised of that contention by the petitioner just prior to trial. Amazingly, when the petitioner advised the court that he had "received involuntarily some minor amount of drugs in [his] food, but it is not affecting [his] perception," the court's only response was "Oh, that's wonderful, that's great, then we are ready to proceed then, aren't we?" And proceed, they did.

The majority takes the view that "there is nothing in the record that reasonably may be interpreted as a clear indicia of potential incompetence sufficient to trigger the trial judge's *sua sponte* duty to evaluate." *Gregg v. State,* at 542. I do not agree. To be sure, as the majority submits, the "fact that (1) there was a competency evaluation in the District Court resulting in a finding of competency, and (2) there may exist a report generated in the District Court proceeding assessing Gregg's competency are not alone sufficient indicia of incompetency to trigger a *sua sponte* duty." Id. at 543. I agree. When evaluating the trial court's duty, we should view the totality of the circumstances, rather than merely base our decision on narrow facts.

As I have demonstrated, when properly viewed with other germane facts, justice demanded that the trial court order, *sua sponte,* that the petitioner be evaluated to determine his

competence to stand; such a duty is imposed on the court as a matter of justice. *Inter alia,* there was the fact that the petitioner had a mental history, there was a transcript of a Constitutionally mandated competency hearing missing, the "non-sequitur" dialogue with the court concerning the petitioner's ability to stand, the petitioner's statement about his food being drugged, the petitioner's difficulty understanding the role of the Public Defender and his cost and the fact that the petitioner was proceeding without counsel.[5] These facts raise a reasonable uncertainty as to the competency of the petitioner to stand trial. Trial courts may not ignore common sense nor turn a blind eye to the totality of the circumstances.

The duty of the trial court to monitor the competency of a defendant to stand trial is a continuing one. Neither Circuit Court judge was bound by the determination of the District Court judge and the trial judge was not bound by the tacit determination made by the court on the petitioner's first appearance in Circuit Court. Nor may the court rely on one factor relevant to, and affecting, competence to the exclusion of others. I submit that in this case, there are an abundance of factors, considering the totality of the circumstances, that required the court's *sua sponte* action to determine the petitioner's competence.

Judge ELDRIDGE has authorized me to state that he joins in this dissent.

---

**5.** Proceeding without counsel does not mitigate the petitioner's being held to the standard of a competent attorney. Refusing representation is but one factor the trial court should consider when considering a criminal defendant's competency to stand trial.