965 A.2d 912

**Jack Lewis HAMMERSLA, Jr.**

v.

**STATE of Maryland.**

**No. 2083, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Feb. 26, 2009.

296

George E. Burns, Jr. (Nancy S. Forster, Public Defender, on brief), for Appellant.

Beverly Peyton Griffith (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: DAVIS, WOODWARD and FREDERICK J. SHARER, (Retired, Specially Assigned) JJ.

WOODWARD, J.

Jack Lewis Hammersla, Jr.[1], appellant, was charged with murder, robbery, theft, assault, burglary, and malicious destruction. A jury trial was held in the Circuit Court for Washington County from October 3–6, 2006. Appellant was found guilty of felony murder, second degree murder, burglary, theft, and malicious destruction of property. He was sentenced to incarceration for life without the possibility of parole on the felony murder charge and to a concurrent term of 30 years on the second degree murder charge. The trial judge merged the burglary charge into the felony murder

---

1. Appellant is also referred to as Jack Lee Hammersla, Jr. in some record documents and in portions of the transcript.

charge and did not impose separate sentences on the theft and malicious destruction charges.

Appellant presents two questions for our review:

I. Did the trial court err in instructing the jury that witnesses had identified [a]ppellant as the person who committed the crime?

II. Did the trial court err in sentencing appellant to life without parole?

We answer "no" to the first question and "yes" to the second.

## FACTUAL BACKGROUND

On the morning of November 12, 2003, Edwyn Finfrock of Smithsburg, Washington County, awoke between 5:00 a.m. and 5:30 a.m. to get ready for work. Finfrock's wife, Shirley, got up with him to make his breakfast as she always did. When Mr. Finfrock left for work around 6:30 a.m., Mrs. Finfrock went back to bed. Mr. Finfrock arrived home from work at 11:25 that morning and called out his wife; after a couple of moments, he went to their bedroom to look for her. He found his wife lying on the floor of their bedroom with blood all over her. He immediately called 911 and told the dispatcher that he thought his wife might have killed herself. The dispatcher advised Mr. Finfrock to begin CPR on his wife.

Upon attempting CPR, Mr. Finfrock noticed that his wife's "head was busted open." There was also blood spattered throughout the bedroom. Mrs. Finfrock was later pronounced dead by emergency medical services employees. According to the autopsy, Mrs. Finfrock died of multiple blunt force injuries to the head between 7:00 a.m. and 8:30 a.m., the victim of a homicide.[2] Upon surveilling his house, Mr. Finfrock noticed some things out of place, as well as a board lying on a divider between the kitchen and the dining room. He believed the board had previously been on his wood pile outside. He later

---

**2.** Mr. Finfrock, initially a suspect in the death of his wife, was excluded as a suspect early on in the investigation.

determined that several items, including his wife's purse, were missing from the home.

Trooper Brian Smith of the Maryland State Police lived down the street from the Finfrock residence and was the first police officer on the scene. When he arrived, Trooper Smith pointed out to Mr. Finfrock that the window in a back door was broken. Mr. Finfrock stated that the window had not been broken when he left for work that morning. Trooper Smith also examined the board found by Mr. Finfrock and believed it to be covered in blood. The medical examiner testified that the board "certainly could have been" the instrument that caused Mrs. Finfrock's injuries. Trooper Smith also located several rocks on the bedroom floor where Mrs Finfrock was found, which were the same type of rocks that he had seen around the railroad track that ran behind the Finfrocks' house.

As part of the investigation, Sergeant Eric Fogle of the Maryland State Police's canine unit arrived at the scene of the homicide with a bloodhound in an attempt to track the suspect from the Finfrocks' home. Sergeant Fogle's team found a heel print and beaten down grass leading away from the house and toward the railroad tracks. The bloodhound found a fresh scent leading west on the railroad tracks. Following the scent led Sergeant Fogle's team to discover fresh footprints, probably from a sneaker, as well as dislodged rocks. During a subsequent search of the area on November 18, 2003, the police located, on the edge of a cornfield one fifth of a mile west of the Finfrocks' home, Mrs. Finfrock's purse, her wallet, an orangish-red knit cap, and a pile of five rocks consistent with rocks from the railroad bed.

On the morning of the incident, November 12, 2003, Christie Phillips (then named Williams) left her house to go to work at 8:50 a.m. As she exited her house, she saw a man stumbling near the railroad tracks; the man caught her eye because she did not recognize him from her small town. She was uneasy with his presence because her home had been burglarized two months prior to that day, and the burglar had not been found.

She watched the man for a few moments as he walked past her while looking over his shoulder several times.

When the man was about 50 feet away from her, Phillips got into her car and wrote down everything she could remember about him: brownish/gray hair, semi-curled, shoulder length; wrinkles; high cheekbones; blue, tan, black, and white flannel jacket; blue tee shirt; baggy blue jeans; black sneakers; dark sunken eyes; and slightly bald on the back of his head. At trial, Phillips identified the flannel jacket, which was taken from appellant at the time of his arrest, as the jacket worn by the man she had seen the morning of November 12. She also identified the jeans and sneakers as clothes that the man had been wearing. Finally, Phillips identified appellant as the man she had seen that morning.

Later on November 12, Investigator Greg Alton of the Washington County Sheriff's Department was called to the scene of the homicide and conducted a walk-through of the Finfrocks' home. After he finished, Investigator Alton returned to the Sheriff's Department where he received a phone call from Phillips. Upon hearing her description of the man she had seen, Investigator Alton realized that he had seen a person matching that description when he had responded to the scene. The man, who garnered the investigator's attention, had shoulder length brown hair and was wearing a multi-colored flannel shirt or jacket. Investigator Alton testified that the jacket taken from appellant upon his arrest was similar in style and color to that of the man he had seen that day. At trial, Investigator Alton identified the man he had seen as appellant.

Four witnesses, Brenda Coleman, Ann Riker, Patricia Biancolli, and Pamela Smith, testified that sometime between 6:30 a.m. and 8:20 a.m., each had seen a man walking on the railroad tracks that ran behind the Finfrocks' house. The women noticed the man because it was unusual to see anyone walking on the railroad tracks. Each woman testified that the man she had seen was wearing a plaid flannel jacket, and each identified the jacket taken from appellant at the time of his

arrest as that jacket. Biancolli further stated that the man was wearing an orange-red knit cap. Coleman and Riker identified appellant as the man they had seen that morning.

At about 1:45 p.m. on November 12, Jennifer Silver noticed a man behind her place of employment when she went to take trash out to the dumpster. He surprised her because she did not expect anyone to be there at that time. She returned inside and asked a male employee, Tony Ralls, to go outside and find out why the man was there. Ralls spoke to the man, who advised him he was "just hanging out, hiding from people." At trial, Silver identified the person she had seen as appellant and stated that he was wearing a blue plaid jacket at that time. Ralls also identified the blue plaid jacket as the one worn by appellant.

Jack Hammersla, Sr., appellant's father, testified that appellant had spent the night at his house on November 11, 2003, and that on the morning of November 12, they had had a disagreement. Hammersla remembered his son wearing blue jeans and a plaid shirt that morning. He identified the plaid shirt as a shirt that he had given to his son. He further identified the orange-red cap found near Mrs. Finfrock's belongings as one owned by his son. After the murder, he searched his house for the hat and was unable to find it.

On November 15, 2003, Renee Brown saw appellant across the street from the diner in which she worked. She noticed him because she had seen a sketch in the newspaper that looked just like him. Once she saw him, she called police. She testified that he had been wearing jeans, a ball cap, and a flannel coat.

Officer Korey Hinkle, then of the Hagerstown Police Department, was dispatched to the diner. Upon arriving at the diner, he saw a man matching the description of the sketch from the newspaper walking down the street. Officer Hinkle stopped the man to question him. The man was wearing two flannel shirts over a buttoned collar shirt and a white tee shirt. He was also wearing black tennis shoes, stained blue jeans,

and a hat. At trial, Officer Hinkle identified appellant as the person he questioned.

Thereafter, Corporal Roy Harsh arrived at the scene, and after asking appellant to consent to a search, placed appellant in his police cruiser. Corporal Harsh transported appellant back to the Sheriff's Department where appellant was advised that he was a person of interest in the Finfrock murder and was questioned by the police. Appellant stated that, until about a week earlier, he had been staying at his father's house, which was right along the CSX railroad tracks. When asked of his whereabouts on the date of the homicide, appellant stated he had "been jumping around from place to place, in Hagerstown." He denied involvement in the murder. During the interview, however, Corporal Harsh noticed what appeared to droplets of blood on appellant's pants and collected appellant's clothes pursuant to a consent to search and seizure form signed by appellant.

Susan Blankenship, a forensic scientist with the Maryland Regional Crime Laboratory, was called to the Sheriff's Department to conduct preliminary tests on the clothes. She also observed noticeable splinters on appellant's hands, which she later removed. Appellant was advised of his *Miranda*[3] rights at 1:20 p.m. on November 15, 2003. After being confronted with the preliminary finding of blood on his clothes, splinters in his hands, and an identification of his photo by Phillips, appellant still denied involvement in Mrs. Finfrock's death. He said that he had found the clothes in a laundromat, that there were numerous ways he could have gotten splinters in his hands, and that he had not been in the area at the time of the murder.

According to Amy Kelly, a forensic scientist with the Maryland State Police, the DNA profile obtained from a stain on appellant's shirt matched that of the victim, Mrs. Finfrock, with the probability of the DNA belonging to an unrelated

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Caucasian individual being one in one hundred sixty quadrillion. Mrs. Finfrock's DNA was also found on the board believed to be the murder weapon.

Appellant was arrested and taken to the Washington County Detention Center. In late 2003 and early 2004, Rodney Wolfe was also incarcerated at the Washington County Detention Center. For a period of time, he and appellant shared a cell block—a series of 18 cells housing 36 inmates. Wolfe learned that appellant was a suspect in the murder of Mrs. Finfrock, and during a conversation about the case, Wolfe asked appellant if the police would find anything on his clothes, to which appellant responded that the police might find blood, "maybe on my pants or sneakers." When Wolfe asked appellant directly if he was involved in Mrs. Finfrock's death, appellant nodded. Wolfe testified that he was not given anything in exchange for his testimony; he just "thought it was the right thing to do."

## LEGAL ANALYSIS

### I. Jury Instruction on Identification of Appellant

█ As his first assignment of error, appellant contends that the trial judge erred in giving the pattern jury instruction on witness identification. Specifically, appellant avers that the instruction erroneously informed the jury that appellant had been identified as the person who committed the crime, when no witness had seen appellant commit any crime. The State counters that the argument was not preserved for appeal, and that, even if preserved, appellant invited any possible error by requesting the instruction with which he now takes issue. Further, the State argues that appellant misconstrued the wording of the instruction and that the instruction was proper under the facts of the case. We agree with the State on all counts.

At trial, the judge instructed the jury as follows:

You have heard evidence regarding the identification of the Defendant as the person who committed the crime. In this connection, you should consider the witness's opportuni-

ty to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness's state of mind, and any other circumstances surrounding the event.

You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility, as well as any other factors surrounding the identification. It is for you to determine the reliability of any identification and give it the weight you believe it deserves. [⁴]

An identification instruction is not mandatory, but may be appropriate and necessary in certain circumstances. *Gunning v. State*, 347 Md. 332, 348, 701 A.2d 374 (1997). The purpose of the identification or any other instruction is to " 'aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict.' " *Janey v. State*, 166 Md.App. 645, 655, 891 A.2d 355 (2006), *cert. denied*, 392 Md. 725, 898 A.2d 1005 (2006) (quoting *Chambers v. State*, 337 Md. 44, 48, 650 A.2d 727 (1994)). The matter of instructing the jury on identification is left to the sound discretion of the trial judge. *Gunning*, 347 Md. at 348, 701 A.2d 374.

In this case, the trial judge considered the propriety of all the jury instructions on several occasions, and counsel also weighed in on the topic. On October 4, 2006, the judge noted that he would review the requested jury instructions that evening, and discuss them with counsel the next day:

THE COURT: Okay. Doesn't seem to be much dispute about the jury instructions that I could see from what was submitted. However, let's just make sure that—why don't, why don't you check in with me at 9:15.

Presumably, that meeting occurred in chambers and off the record on the morning of October 5, 2006. Then, prior to the

---

4. The jury instruction as given is nearly a verbatim recitation of Maryland Criminal Pattern Jury Instruction 3:30.

resumption of the trial and on the record, defense counsel brought up the issue of jury instructions, stating:

[DEFENSE COUNSEL]: Your Honor, if I may just, on jury instructions. Just to clarify. I had put down impeachment by prior conviction—Jerry Morsel and Vincent Mahoney. That would just be Rodney Wolfe instead. I wanted to make that correction.

THE COURT: I saw that last night when I was reviewing it and I did—I'm pretty sure I changed that. Let's see here.

\* \* \*

THE COURT: That's, that's what I have.

[DEFENSE COUNSEL]: Thank you, Your Honor.

THE COURT: Okay. We're ready for the jury then? Bring them in.

There was another lengthy conversation between the judge and counsel regarding jury instructions after the close of all the evidence. Defense counsel did not refer to any issue that he had with any jury instruction other than that already mentioned above. After giving the jury instructions, the trial judge specifically asked both sides if there were any exceptions to the instructions as given, and both parties said there were not.

Appellant concedes that he did not object to the allegedly erroneous jury instruction, as is required for appellate review, but he asks that we exercise our discretion to review the matter under the plain error doctrine.

Maryland Rule 4–325(e) states:

No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in

the instructions, material to the rights of the defendant, despite a failure to object.

■ Rule 4–325(e) makes it clear that a failure to object to a jury instruction at trial ordinarily constitutes a waiver of a claim that the instruction was erroneous. *Morris v. State*, 153 Md.App. 480, 509, 837 A.2d 248 (2003), *cert. denied*, 380 Md. 618, 846 A.2d 402 (2004). However, Rule 4–325(e) also grants us " 'plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court.' " *Brown v. State*, 169 Md.App. 442, 457, 901 A.2d 846, *cert. denied*, 395 Md. 56, 909 A.2d 259 (2006) (quoting *Danna v. State*, 91 Md.App. 443, 450, 605 A.2d 150 (1992)). Plain error is error that vitally affects a defendant's right to a fair and impartial trial. *Id.* (citing *State v. Daughton*, 321 Md. 206, 211, 582 A.2d 521 (1990)).

■ We have said that we should exercise this discretion in favor of review when the unobjected to error is " 'compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial.' " *Smith v. State*, 64 Md.App. 625, 632, 498 A.2d 284 (1985) (quoting *State v. Hutchinson*, 287 Md. 198, 203, 411 A.2d 1035 (1980)). Consequently, appellate review under the plain error doctrine "1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon." *Morris*, 153 Md.App. at 507, 837 A.2d 248. Additionally, the plain error hurdle, " 'high in all events, nowhere looms larger than in the context of alleged instructional errors.' " *Martin v. State*, 165 Md.App. 189, 198, 885 A.2d 339 (2005), *cert. denied*, 391 Md. 115, 892 A.2d 478 (2006) (quoting *United States v. Sabetta*, 373 F.3d 75, 80 (1st Cir.2004)) (emphasis removed). We see nothing in the giving of the contested instruction that would even come close to necessitating our review under the plain error doctrine.

■ Simply stated, the plain error doctrine requires that there be error that is plain. *See Martin*, 165 Md.App. at 195–96, n. 3, 885 A.2d 339 (citing *Johnson v. U.S.*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). We are not

convinced that there was any error, plain or otherwise, by the trial judge in giving the subject instruction.

Although it is true that no witness saw appellant actually commit the crime, numerous witnesses did see appellant on the day of the murder in the vicinity of the victim's home around the time of the victim's death. Numerous witnesses also testified that when seen, appellant was wearing the flannel shirt or jacket that was later found to contain the victim's DNA. His knit cap was found near items taken from the Finfrock residence. He was found to have splinters in both hands that could have come from the board used to kill the victim. He told another inmate at the detention center that police might find blood on his clothes and nodded when asked if he had killed Mrs. Finfrock. The evidence against appellant was circumstantial, but circumstantial evidence alone can be sufficient to prove the guilt of a defendant. *Jensen v. State,* 127 Md.App. 103, 117, 732 A.2d 319, *cert. denied,* 356 Md. 178, 738 A.2d 855 (1999).

The instruction as given by the judge merely reminded the jury that they had "heard evidence *regarding* the identification of the Defendant as the person who committed the crime." (Emphasis added). In essence, the jurors were instructed they had heard evidence *about* the identification of appellant, not that appellant had been definitively identified as the person who committed the crime. The jury was instructed that it should "consider the witness's opportunity [or the lack thereof] to observe the criminal act and the person committing it." The jury was also specifically advised that it was up to them to "determine the reliability of any identification and give it the weight you believe it deserves." The ultimate determination of whether appellant had been identified as the person who committed the crime beyond a reasonable doubt was properly left to the jury.[5]

---

5. The trial court also gave the jury the pattern instruction on direct and circumstantial evidence. *See* Maryland Criminal Pattern Jury Instruction 3:01. That instruction provides, in relevant part, that "[t]here are two types of evidence—direct and circumstantial," that "[t]he law

■ Additionally, even if we assume, *arguendo*, that it might have been error for the trial judge to give the instruction, we must point out that appellant was actually the party who requested that the instruction be given. Thus, it can be said that appellant invited the error, if any. A defendant who creates error cannot "obtain a benefit—a mistrial or reversal—from that error." *Ruth v. State*, 133 Md.App. 358, 373, 757 A.2d 152, *cert. denied*, 361 Md. 435, 761 A.2d 933 (2000); *see Klauenberg v. State*, 355 Md. 528, 544, 735 A.2d 1061 (1999).

## II. Sentence of Life without Parole

■ Appellant next argues that his sentence of life without the possibility of parole for the felony murder charge was impermissible because the State failed to file a timely notice of its intention to seek that enhanced penalty. The State counters that a timely notice was filed before the original trial of this matter and that such notice should suffice to advise appellant of the State's intentions. On this issue, we must agree with appellant.

Maryland Code (2002), § 2–203 of the Criminal Law Article ("CR"), provides:

A defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole only if:

(1) at least 30 days before trial, the State gave written notice to the defendant of the State's intention to seek a sentence of imprisonment for life without the possibility of parole; and

(2) the sentence of imprisonment for life without the possibility of parole is imposed in accordance with § 2–304 of this title.

Thus, when the State wishes to seek the punishment of life without the possibility of parole, it must give written notice of

---

makes no distinction between the weight to be given to either direct or circumstantial evidence," and that "[i]n reaching a verdict, you should weigh all of the evidence, whether direct or circumstantial."

its intention to the defendant at least 30 days before the trial of the matter. Appellant alleges that he did not receive the required notice in a timely manner.

This issue is complicated by the fact that the case giving rise to his appeal had been tried once before on June 28, 2004. After appellant was convicted in the 2004 trial, he appealed to this Court, and, in an unreported opinion,[6] we reversed the judgment and remanded the case to the circuit court for a new trial.

On May 19, 2004, more than 30 days before the first trial, the State timely filed its notice of intention to seek life imprisonment without the possibility of parole. On August 14, 2006, more than 30 days before the start of this trial on October 3, 2006, the State sent defense counsel a letter making a plea offer. In that letter, the State offered to "withdraw its request that the court impose a sentence of life without parole as to the first-degree murder charge and, instead, ask the court to impose a sentence of life" if the plea bargain was accepted by appellant by September 15, 2006. After the expiration of the plea offer, the State filed a notice of its intent to seek life imprisonment without the possibility of parole on September 19, 2006, which was less than 30 days before the start of the trial on October 3, 2006.

Appellant argued, prior to sentencing, that the original notice of May 19, 2004, was ineffective and should be stricken. The trial judge denied the motion to strike the State's notice, correctly noting that "there is no Maryland appellate case that resolves the precise issue raised in the case at bar," but that, after reviewing the case law, he was "persuaded that the State in this case was not required to refile a written notice expressing its intention to seek a sentence of life in prison without the possibility of parole." The trial judge went on to sentence appellant to life in prison without the possibility of parole on the felony murder charge.

---

6. *Hammersla v. State,* No. 1554, September Term, 2004 (filed February 1, 2006).

At the heart of this matter, then, is whether either the notice of May 19, 2004, or the letter of August 14, 2006, containing the plea bargain offer was sufficient notice under CR § 2–203 to allow the imposition of a sentence of life imprisonment without the possibility of parole. We conclude that neither document satisfied the notice requirement of CR § 2–203.

The trio of Maryland cases cited by the trial judge is instructive on the question presented. In *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), the appellant argued that his third sentencing proceeding was null and void because the State failed to comply with the notice requirement of Art. 27, § 412(b) [7] (currently codified in CR § 2–202). *Id.* at 439, 468 A.2d 1. In *Tichnell,* the State sought the death penalty, which required notice to the defendant 30 days prior to trial. Tichnell received timely notice before his trial, *id.* at 439, 468 A.2d 1, but had appealed his death sentence on two prior occasions, and the sentence had been vacated and remanded to the trial court for resentencing each time. *Id.* at 436, 468 A.2d 1. This case encompassed his third appeal of his death sentence, and Tichnell argued that, because he had not received another notice of the State's intention before his third capital sentencing proceeding, the sentence of death could not be imposed. *Id.* at 439, 468 A.2d 1.

The Court of Appeals disagreed, reasoning the "[S]ection 412(b) does not require that the States give additional notice before commencing the capital sentencing proceeding. Plainly, the word 'trial,' in the context of its usage in § 412(b), does not encompass a resentencing proceeding." *Id.* The Court

---

7. Art. 27, § 412(b) provided, in pertinent part:

(b) *Penalty for first degree murder.*—A person found guilty of murder in the first degree shall be sentenced to death or imprisonment for life. The sentence shall be imprisonment for life unless: (1) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death, and advised the person of each aggravating circumstance upon with it intended to rely, and (2) a sentence of death is imposed in accordance with § 413.

went on to state, however, that, with some exceptions, a defendant who successfully challenges his conviction may be retried under the rationale that " 'the defendant wiped the slate clean and the parties may start anew.' " *Id.* at 440, 468 A.2d 1 (quoting *Jones v. State,* 288 Md. 618, 625, 420 A.2d 1241 (1980)).

In *Gantt v. State,* 73 Md.App. 701, 536 A.2d 135 (1988), this Court held that a remand to the trial court for correction of an error in the sentencing did not require a renewal of a notice of intent to invoke a mandatory sentence as required by Md. Rule 4–245(c) [8]. We stated that a criminal proceeding consisted, theoretically, of five stages: (1) the accusatory stage resulting in the filing of the indictment, (2) the stage at which any pretrial motions could be filed and resolved, (3) the actual trial on the merits of guilt or innocence, (4) the filing of the State's Attorney's notice of intention to proceed under mandatory sentencing procedures, and (5) the sentencing hearing itself. *Id.* at 704, 536 A.2d 135. Because the error occurred at stage five, the remand required only that that stage be repeated. *Id.* The notice given by the State, as well as the other stages, remained in full effect as those stages were free from error. *Id.*

In *Gorge v. State,* 386 Md. 600, 873 A.2d 1171 (2005), the appellant was tried by a jury and convicted of felony murder, premeditated murder, and robbery. *Id.* at 603–04, 873 A.2d 1171. At the sentencing hearing, defense counsel questioned whether the State had filed a written notice of its intention to seek a sentence of life imprisonment without the possibility of parole; neither side could find the document. *Id.* at 609, 873

---

**8.** Md. Rule 4–245(c) provides:

> (c) **Required notice of mandatory penalties.** When the law prescribes a mandatory sentence because of a specified previous conviction, *the State's Attorney shall serve a notice of the alleged prior conviction on the defendant or counsel at least 15 days before sentencing in circuit court* or five days before sentencing in District Court. If the State's Attorney fails to give timely notice, the court shall postpone sentencing at least 15 days unless the defendant waives the notice requirement.

(Emphasis added).

A.2d 1171. Defense counsel conceded that she "knew" the State intended to seek life without the possibility of parole and was given "oral notice" of the State's intent more than 30 days prior to the trial date. *Id.* The State relied on a plea letter that was received by appellant less than 30 days before trial. *Id.* Therein, the State indicated it would argue for a sentence of life without the possibility of parole " 'pursuant to the Notice that has been filed.' " *Id.* The trial court reviewed the docket entries and was unable to find said notice, but concluded that it would sentence the appellant on the basis that appellant did have actual notice. *Id.* at 610, 873 A.2d 1171.

The Court of Appeals first stated that whether Gorge could be sentenced to life without the possibility of parole, without having received written notice of the State's intention to pursue that sentence, is "purely a matter of law, involving the interpretation of a statute." *Id.* at 610, 873 A.2d 1171. The Court noted that the statute at issue—the same as at issue in the case *sub judice*—is an enhanced penalty statute. As a result, "it is highly penal, and must be strictly construed." *Id.* at 613, 873 A.2d 1171 (citing *Johnson v. State,* 362 Md. 525, 529, 766 A.2d 93 (2001)).

The Court determined that the language of CR § 2–203 is unambiguous and that, according to such language, "the court may *only* sentence a defendant to life without the possibility of parole *if* the State gave timely written notice to the defendant." *Id.* at 614, 873 A.2d 1171 (emphasis in original). Therefore, the Court held that actual notice, instead of written notice, was insufficient to satisfy the statutory prerequisite for the imposition of a sentence of life without the possibility of parole. *Id.* at 618, 873 A.2d 1171. The Court reasoned that to

> hold that actual notice will suffice, ignores the plain language of the statute we must construe. Section 2–203 describes what constitutes fair notice—written notice at least 30 days before trial. Simply stated, we are not permitted to ignore the language of the statute.

*Id.* (footnotes omitted).

 This, we believe, is the crux of the matter. The plain language of CR § 2–203 requires the State to provide the

defendant with timely written notice of its intent to seek a life sentence without the possibility of parole. The statute clearly and unambiguously states that a "defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole only if: (1) at least 30 days before trial, the State gave written notice to the defendant." As noted by the Court of Appeals in *Gorge,* it is unclear how " 'only if' can be interpreted any other way." 386 Md. at 613, 873 A.2d 1171. If "the language used [in a statute] is unambiguous, and consistent with the statute's apparent purpose, it should be accorded its ordinary meaning." *Thanos v. State,* 332 Md. 511, 522, 632 A.2d 768 (1993). Additionally, " '[w]hen a legislative body commands that something be done, using words such as "shall" or "must," rather than "may" or "should," we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed.' " *Id.* (quoting *Tucker v. State,* 89 Md.App. 295, 298, 598 A.2d 479 (1991)).

CR § 2–203 allows a trial court to sentence a defendant to life without the possibility of parole only if the State gave timely written notice to the defendant; "[i]n view of the seriousness of the sentence and the unambiguous language of the statute, construing the statute to require timely written notice is the most reasonable construction." *Gorge,* 386 Md. at 614, 873 A.2d 1171 (footnote omitted). *See also Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004) ("Enhanced penalty statutes are highly penal statutes and must be construed strictly in order to prevent punishment not contemplated by the Legislature.").

In the case at bar, the State filed a timely notice of its intention to seek the enhanced penalty of life without the possibility of parole prior to the first trial. After that trial, appellant's conviction was reversed on appeal, and a new trial was ordered. The reversal of appellant's conviction, with an order for a new trial, "wiped the slate clean," and the case began anew procedurally. Referring to the five stages of a criminal proceeding articulated in *Gantt,* appellant's case returned to stage (2), "the stage at which any pretrial motions

could be filed and resolved." 73 Md.App. at 704, 536 A.2d 135. Thus a new notice under CR § 2–203 was required if the State wished to seek a life sentence without the possibility of parole. Here, the State did in fact file such notice, but did not do so within the time limits prescribed by CR § 2–203.

We also conclude the letter containing the plea offer did not suffice as the required notice. The letter did not provide notice of the State's intention to seek the penalty of life without parole. It merely purported, as a bargaining chip, to remove that possibility if the offer were accepted. When appellant failed to accept the plea offer by the expiration date of September 15, 2006, the State, apparently realizing that the plea letter did not constitute the required notice, proceeded to file the notice of its intent to seek a sentence of life without the possibility of parole on September 19, 2006, too late under CR § 2–203. In a case involving "a sentence as serious as life without the possibility of parole, it is entirely reasonable to require the State to follow the letter of the law." *Gorge*, 386 Md. at 619–20, 873 A.2d 1171. In this matter, it did not do so.

**SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR WASHINGTON COUNTY FOR RESENTENCING ON THE CONVICTION FOR FELONY MURDER; ALL OTHER JUDGMENTS AFFIRMED; COSTS TO BE SPLIT EQUALLY BETWEEN APPELLANT AND WASHINGTON COUNTY.**