REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2211

September Term, 2012

MARIO SIBUG

v.

STATE OF MARYLAND

Krauser, C.J.,
Wright,
Rodowsky, Lawrence F.
    (Retired, Specially Assigned),

JJ.

Opinion by Krauser, C.J.

Filed: October 2, 2014

In 1999, Mario Sibug, appellant, was charged with multiple counts of assault and related handgun offenses,[1] all of which arose out of a single incident. That same year, he pleaded not guilty, in the Circuit Court for Baltimoire County, to those charges and alleged that he was not competent to stand trial. The Baltimore County circuit court subsequently ordered him committed to the Clifton T. Perkins Hospital Center ("Perkins") for inpatient care and treatment. There, he remained for the next four years until Perkins, in a letter to the circuit court, expressed its view that Sibug was now competent to stand trial.

In May of 2004, Sibug was transported from Perkins to the courthouse, where he entered a plea of not guilty, on an agreed statement of facts, to the 1999 charge of second-degree assault, and was sentenced to a term of four-and-a-half years' imprisonment on that charge. A year later, however, the circuit court vacated his conviction and sentence, concluding that Sibug's trial counsel had rendered ineffective assistance of counsel by not informing him of the immigration consequences of his assault conviction, and granted Sibug a new trial.

Sibug was retried in September of 2008. After a jury found him guilty of multiple counts of assault, using a handgun in the commission of a crime of violence, and giving minors access to a firearm, he was sentenced to a term of ten years' imprisonment. Although Sibug did not note an appeal from his convictions, three years later he did file a petition for

---

[1]Sibug was charged with three counts of first-degree assault, two counts of second-degree assault, three counts of reckless endangerment, one count of using a handgun in the commission of a crime of violence, and one count of permitting a minor access to a firearm.

post-conviction relief and was thereafter granted the right to file a belated appeal. Having

done so, he now presents two questions for our consideration. Rephrased to facilitate review,

they are:

> I. Was Sibug's right to due process of law violated by the court's failure to determine, prior to his new trial, that he was competent to stand trial?

> II. Did the trial court err in finding, at the sentencing hearing following Sibug's new trial, that he was competent to stand trial?

Finding no merit to either contention, we affirm.

## Background

In October of 1998, Sibug called his five children to the kitchen table. When the

family had gathered as demanded, Sibug pulled out a handgun and pointed it at each of his

children, and then "cock[ed]" it to demonstrate that it was loaded. He then instructed his

frightened children that they were to stop acting "rebellious" and were to respect his authority

as their father.

A month later, Sibug's fifteen-year-old son called the police to report this incident.

He told them that Sibug, after becoming angry with him and his siblings, had pointed a gun

at him and that he was afraid that his father was going to kill him. When Baltimore County

police subsequently arrested Sibug, they found a handgun, as well as an assault rifle, lying

on shelves in Sibug's bedroom at the family's residence. Both guns were in cases, but

neither case was locked and both weapons were loaded and fully operable. Sibug was

2

ultimately charged with multiple counts of both first-degree assault and second-degree assault, reckless endangerment, and using a handgun in the commission of a crime of violence, as well as permitting a minor access to a firearm.

When Sibug subsequently alleged that he was not competent to stand trial, the Baltimore County circuit court ordered the State Department of Health and Mental Hygiene ("the Department") to examine Sibug.[2]  In accordance with that order, Sibug was admitted to Perkins for evaluation on November 2, 1999.

A little more than a month later, Perkins sent a letter and a "competency evaluation" of Sibug to the circuit court.  In that evaluation, Perkins opined that Sibug was not competent to stand trial and was suffering from a mental disorder that rendered him "dangerous" to himself and others.  The evaluation further disclosed that Sibug believed that his children were "bad" and "lawless" in spite of his "godly instruction," and that he had decided to discipline his children according to the Bible and "God's law."  Perkins ultimately diagnosed Sibug as suffering from both a "Delusional Disorder, Mixed Type" and a "Narcissistic Personality Disorder."[3]

---

[2]The circuit court may order the Department to examine an accused to determine his competence to stand trial.  Md. Code Crim. Proc. § 3-105(a) (2001, 2008 Repl. Vol.).  If the court orders such an examination, the Department must send a copy of the report of its findings to defense counsel, the State's Attorney, and the court.  Md. Code Crim. Proc. § 3-105(d) (2001, 2008 Repl. Vol.).

[3]The record does not provide additional details as to the specifics of these diagnoses.

3

As for Sibug's competency to stand trial, the Perkins evaluation stated that, although Sibug understood the operation and purpose of the judicial system, he was convinced that he would not receive a fair trial because "the judicial system and its agents are 'of Satan,'" and the prosecution against him was a battle between the "righteous" and the "wicked." He therefore intended to base his defense on Scripture. The evaluation concluded that Sibug was unable to "appreciate" the proceedings against him or to assist a lawyer in his defense, particularly if the lawyer did not share his religious beliefs. In light of that evaluation, the circuit court found, on January 13, 2000, that Sibug was not competent to stand trial and then ordered that Sibug be committed to the Department for inpatient care and treatment at Perkins until the court was "satisfied that [he was] no longer incompetent to stand trial."

Four months later, on May 1, 2000, Perkins sent the circuit court a letter and a new evaluation that opined that, in its view, Sibug was now competent to stand trial and, furthermore, it believed that he was "criminally responsible"[4] at the time of the offense. Sibug's trial was subsequently set for August 28, 2000.[5] But three-and-a-half weeks before that trial was to occur, the court received, on August 3, 2000, yet another letter from Perkins.

---

[4]An accused is considered to be "not criminally responsible for criminal conduct if, at the time of that conduct, the [accused], because of a mental disorder or mental retardation, lacks substantial capacity" to either "appreciate the criminality of that conduct" or "conform that conduct to the requirements of law." Md. Code Crim. Proc. § 3-109 (2001, 2008 Repl. Vol.).

[5]There is nothing in the record to suggest that the circuit court made any findings or rulings as to Sibug's competency after it received the May 1st letter from Perkins.

This letter advised that Sibug's condition had "deteriorated" and that, consequently, he was currently not competent to stand trial.

Almost three years later, on May 27, 2003, Perkins sent another letter to the circuit court, informing it that Sibug's condition had improved as a result of the medication he was receiving and that, as a consequence, Sibug was now competent to stand trial. Although Perkins requested that the court schedule a hearing to determine Sibug's competence to do so and attached, to that letter, a "draft order of competence" for the court to execute, the record does not contain this order or provide any indication that a hearing was ever held.

On September 22, 2003, Sibug entered, in the Baltimore County circuit court, pleas of not guilty and not criminally responsible "at the time of the commission of the offenses alleged," but did not claim that he was not competent to stand trial. Two days later, the circuit court, once again, ordered the Department to examine Sibug and determine whether he was criminally responsible "at the time of [his] alleged criminal conduct." But nothing in that order required the Department to determine whether Sibug was presently competent to stand trial.

Perkins informed the court, in a letter received on October 20, 2003,[6] of its conclusion that Sibug was criminally responsible "at the time of the offense," as indicated by the accompanying report. That letter was followed by two additional letters from Perkins, the

_____

[6]It is unclear whether this letter was sent in direct response to the court's September 24th order that Sibug be evaluated to determine whether he was criminally responsible at the time of the alleged offenses.

5

first on December 4, 2003, and the second on January 14, 2004; both of which reiterated that Sibug was presently competent to stand trial.

On May 11, 2004, four months after Perkins sent its final letter opining that Sibug was competent to stand trial, Sibug appeared in Baltimore County circuit court and, though no competency hearing had been held or a formal judicial finding of competency made, entered a plea of not guilty, on an agreed statement of facts, to one count of second-degree assault. The court then found Sibug guilty and sentenced him to a term of four-and-a-half years' imprisonment, but granted him credit for time served, which resulted in Sibug's immediate release. During that proceeding, neither defense counsel, the State, nor the court raised the question of Sibug's competence to stand trial.

Only two months later, Sibug filed a petition for writ of error coram nobis in the Baltimore County circuit court, contending, among other things, that he had not been advised of the effect a conviction for assault would have on his immigration status.[7] On June 21, 2005, the circuit court, upon finding that Sibug's trial counsel had rendered ineffective assistance of counsel by not advising him of the immigration consequences of his assault conviction, granted Sibug's petition for writ of error coram nobis, vacated his sentence, and granted Sibug a new trial.

---

[7] Sibug was born in the Phillippines but had been a permanent resident of the United States since 1993. The Immigration and Nationalization Service issued a warrant for Sibug's arrest one day after he was found guilty of second-degree assault. Because of his assault conviction, Sibug was facing deportation to the Phillippines.

Three years later, on September 10, 2008, Sibug's new trial commenced before a jury in the Baltimore County circuit court. The record reveals that, in the three years between the circuit court's order granting a new trial and the start of that trial, Sibug never pleaded that he was not competent to stand trial, nor did he or his counsel give any indication to the court that his competence was in issue.

At trial, the jury heard testimony from three of Sibug's children regarding the events of October of 1998. Sibug's oldest son, who had reported the incident to the police, recalled Sibug pointing his handgun at each of the children and that he had been "scared" and "thought [he] was going to die."[8] Then, testifying on his own behalf, Sibug admitted that he placed his handgun on the kitchen table, while sitting with his children, but said that he was only trying to "get [his children's] attention" because they did not respect and love him and, consequently, did not respect and love the teachings of the Bible. His display of a handgun was, in his words, to "test" his children's "faith."

The jury found Sibug guilty of two counts of first-degree assault, two counts of second-degree assault, one count of using a handgun in the commission of a crime of violence, and one count of giving minors access to a firearm. A motion for a new trial followed in which Sibug alleged, for the first time, that he had not been competent to stand

---

[8]Another child testified that he remembered Sibug placing the gun on the kitchen table but did not recall whether his father pointed the gun at any of them, and the third and last child to testify had no recollection of the incident at all.

7

trial, which was bourne out, asserted the motion, by Sibug's testimony at trial and "his lack of intelligent communications with his trial attorney."[9]

At Sibug's sentencing proceeding on October 31, 2008, over a month after his trial had ended, the court considered his motion for a new trial. At that time, the court asked Sibug's counsel whether he wished to proffer any "additional evidence" as to Sibug's competence to stand trial. Defense counsel responded that he was "not prepared" to do so.[10] After observing that neither Sibug nor his counsel had ever alleged, either before or during trial, that Sibug's competency was in question; that the court file contained the January 14, 2004 letter from Perkins stating that, in its opinion, Sibug was competent to stand trial; and that Sibug had "seemed to understand exactly what was going on" during his trial proceedings, the court found that Sibug was competent to stand trial. It therefore denied Sibug's motion for a new trial and sentenced him to a total of ten years' imprisonment with credit for pre-trial detention, which included the time that Sibug had been committed to Perkins.

Although Sibug did not appeal his convictions, he filed, two-and-a-half years later, on March 8, 2011, a *pro se* petition for post-conviction relief, seeking the right to file a

_____

[9]The circuit court noted that the certificate of service filed with Sibug's motion for a new trial "reflect[ed] a notice of appeal and not a motion for new trial." Because of that error, the court docketed the motion as "correspondence only" and did not rule on the motion.

[10]Defense counsel also informed the court that Sibug wished to proceed to sentencing and had asked him to withdraw his motion, but counsel felt he had "to make this motion as his lawyer" and asked the court to grant a new trial so that Sibug's competence could be evaluated.

belated notice of appeal. On December 18, 2012, with the consent of both sides to the controversy, the circuit court entered an order granting Sibug the right to file a belated notice of appeal within thirty days. This appeal followed.

**Discussion**

**I.**

Sibug contends that the circuit court denied him due process of law in failing to determine whether he had regained his competence to stand trial before proceeding with his re-trial. He points out that, after the circuit court found him to be incompetent to stand trial in 2000, the court never subsequently formally found him to be otherwise. The court erred, he insists, in trying him in 2008 without rendering such a finding.

It is "well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992); *see also Trimble v. State*, 321 Md. 248, 254 (1990) ("If a state fails to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent, it denies him due process."). To be "not competent to stand trial" means that a defendant is not able "(1) to understand the nature or object of the proceeding; or (2) to assist in [his] defense." Md. Code Crim. Proc. § 3-101(f) (2001, 2008 Repl. Vol.). Conversely, "to be competent to stand trial" means that a defendant has the "present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against

9

him." *Thanos v. State*, 330 Md. 77, 85 (1993) (internal citation omitted). In any event, until proven otherwise, a defendant is presumed to be competent to stand trial. *Peaks v. State*, 419 Md. 239, 251 (2011).

In "plac[ing] the duty to determine competence to stand trial on the trial court," *Gregg v. State*, 377 Md. 515, 526 (2003), the legislature has mandated "precise actions to be taken by a trial court when an accused's competency to stand trial [is] questioned," *Roberts v. State*, 361 Md. 346, 363 (2000). Of particular relevance to any competency determination is section 3-104(a) of the Criminal Procedure Article,[11] which states:

> If, before or during a trial, the defendant in a criminal case . . . appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented in the record, whether the defendant is incompetent to stand trial.

In other words, there are three ways a trial court's duty to determine a defendant's competence may be triggered: upon the motion of the defendant, upon the motion of the defendant's counsel, or "upon a *sua sponte* determination by the court that the defendant may not be competent to stand trial." *Thanos*, 330 Md. at 85. Once a defendant's incompetence to stand trial has been alleged, the actions a court must take in determining his or her competence are organized into three successive steps:

> (1) First, a determination of competency may be made at any time before or during a trial; (2) Second, such a determination must be made if the defendant in a criminal case appears to be

---

[11]Md. Code Crim. Proc. § 3-104(a) (2001, 2008 Repl. Vol.).

10

> incompetent to stand trial or the defendant alleges incompetence to stand trial; and (3) Finally, the court must make its determination on the evidence presented on the record.

*Wood v. State*, 436 Md. 276, 286 (2013) (quoting *Roberts*, 361 Md. at 364).

The first step "specifies the time frame within which the question of the [defendant's] competency must be made," the second step requires that the issue of competency be "properly before the court," and the third step ensures that the defendant's due process rights are protected. *Id.* at 286–87. Although the court's determination of competence "need not be in the form of a formal hearing," *Peaks*, 419 Md. at 254, if the defendant's allegation of incompetence is "unsupported by any evidence on the record to that time," the defendant must be allowed to "present evidence on which a determination may be made," *Gregg*, 377 Md. at 539. Finally, the court's determination of competency "is to be held to a standard of beyond a reasonable doubt." *Roberts*, 361 Md. at 365–67.

It is clear from the record that the issue of Sibug's competence was properly before the circuit court before his initial trial when he alleged, in 1999, that he was not competent to stand trial. The sentence he subsequently received was vacated on the grounds of ineffective assistance of counsel, and he was awarded a new trial. But the issue of Sibug's competence was never raised by counsel or Sibug's courtroom behavior prior to or during his new trial in 2008.

Given that the reversal of a conviction "with an order for a new trial, 'wipe[s] the slate clean,' and the case [begins] anew procedurally," returning the case to the stage where "any

11

pretrial motions could be filed and resolved," *Hammersla v. State*, 184 Md. App. 295, 313–14 (2009), it was incumbent upon Sibug, or his counsel, to raise the issue of incompetency anew. *Cf. Harrod v. State*, 423 Md. 24, 34–36 (2011) (explaining that the grant of a mistrial, like the grant of a new trial, "requires the litigants to observe pretrial procedures once again," including the State's obligation to give notice of its intent to introduce a chemist's report even though the same report had been introduced at the first trial); *Marshall v. State*, 213 Md. App. 532 550–54 (2013) (concluding that the grant of a new trial "effectively wipe[d] out the prior proceedings" and required the defendant to allege at his second trial that the Maryland gang statute was unconstitutional even though he had raised that same issue prior to his first trial).

Although no appellate decision has stated that a defendant's incompetence to stand trial must be raised anew, by court, counsel, or circumstances, after a new trial has been granted, the Court of Appeals' decision in *Gregg v. State* has lent helpful guidance to us in reaching the conclusion that we do today. In that case, the District Court of Maryland ordered a competency evaluation of John Leon Gregg, who was charged with second-degree assault. 377 Md. at 518. At the competency hearing that followed, the district court—after reviewing the report prepared by the facility where Gregg had been evaluated, hearing testimony from one of Gregg's evaluators, and questioning Gregg directly—found Gregg competent to stand trial. *Id.* at 518–22. Gregg subsequently prayed a jury trial and the case was transferred to the circuit court, where Gregg was tried by a jury and found guilty. *Id.* at

523. He thereafter noted an appeal, contending that the circuit court had a duty to inquire into his competence to stand trial and had erred in failing to do so. *Id.* at 524–25.

The Court of Appeals explained that, when Gregg's case was removed to the circuit court, "the proceedings properly began anew," and the circuit court was not bound by the district court's ruling on "pre-trial matters," including any prior determination of Gregg's competence. *Id.* at 542–43. Since the circuit court trial was a "separate and distinct" proceeding from the district court trial, the issue of Gregg's competence to stand trial had to be "raised anew in the Circuit Court proceedings," according to the Court of Appeals, "in order to compel the need for a competency determination." *Id.* at 545. Because that issue was not raised anew in the circuit court, and because Gregg's behavior at trial did not trigger any obligation of that court to evaluate his competence *sua sponte*, the issue of Gregg's competency "was not properly before the court," said the Court of Appeals, and thus the circuit court did not err in failing to address it. *Id*. at 541–45.

As Gregg's circuit court trial was "separate and distinct" from the preceding district court proceeding, so too was Sibug's new trial "separate and distinct" from his first trial. It, in effect, "wiped the slate clean." *Hammersla v. State*, 184 Md. App. at 313. It is therefore clear that the issue of competence had to be raised afresh at Sibug's new trial, a conclusion particularly compelling in the instant case, given that four-and-a-half years had passed since his first trial and that he was ultimately assessed as competent, if not by the court then at least by the evaluators at Perkins. Thus, if Sibug wished to again raise the issue of his

competence, he was required to bring that issue to the court's attention before or during his new trial.

But, at no time before or during his new trial did Sibug or his counsel allege, suggest, or give the slightest indication that his competence might be at issue. And, since the court was never asked to evaluate Sibug's competency by anyone, the "only way" in which the question of competency could have been placed before the circuit court was if Sibug "appear[ed] to the court to be incompetent to stand trial," triggering the court's "*sua sponte* duty*" to evaluate his competence. *Gregg*, 377 Md. at 545. But there was nothing about Sibug's appearance, conduct, or behavior that indicated to the court that such an evaluation was appropriate.

As we have previously explained, a defendant is considered competent to stand trial if he has the "present ability to consult with his lawyer with a reasonable degree of rational understanding" to assist in his own defense, as well as a "rational as well as factual understanding of the proceedings against him." *Thanos v. State*, 330 Md. 77, 84–85 (1993). The circuit court, in finding at sentencing that Sibug was competent to stand trial, recalled its observations of Sibug during the trial and concluded that Sibug "seemed to understand exactly what was going on" during the proceedings. The court's conclusion is supported by the record.

At no time during trial did it appear from the transcript of that proceeding that Sibug did not have the ability to work with his lawyer and to assist in his own defense. In fact,

14

when he was called to the stand, he gave coherent responses to his counsel's questions, elaborating lucidly upon those responses when asked to do so. Then, on cross-examination, Sibug responded to the State's questions without any outbursts or digressions and even engaged in efforts to correct the State when he believed it had mis-characterized his testimony.[12]

Furthermore, Sibug appeared to have a complete understanding of why he was being prosecuted and what his role was in the proceedings against him. Before taking the stand to testify, Sibug informed the court that he could not "swear" but that he could "appear . . . for the record," indicating that he understood the importance of testifying under oath. And, although his testimony was heavily infused with references to Scripture, Sibug provided a rational, albeit disturbing, justification for his actions, explaining that he brought his handgun out in front of his children not to scare them but to "test their faith." Their faith needed to

---

[12]The following exchange is illustrative of Sibug's ability to comprehend and disagree with the State's questions on cross-examination:

> [STATE'S ATTORNEY]: You felt it was okay to scare your kids by putting the gun in front of them, right?
>
> [SIBUG]: No, sir. You are the one who said it. Don't put something in my mouth.
>
> [STATE'S ATTORNEY]: I'm asking you a question.
>
> [SIBUG]: No, sir. I just said, you know, testing their faith.

15

be tested, he said, because they were "rebellious" and "wicked," and they did not respect his authority as their father.

Moreover, Sibug's attentive and appropriate behavior at trial stands in stark contrast to the actions of defendants who, in other cases, such as *Trimble v. State*, 321 Md. 248 (1990), and *Thanos v. State*, 330 Md. 576 (1993), later claimed on appeal that their behavior at trial was so abnormal as to warrant a competency hearing. Although the actions of the defendants in those cases were, unlike Sibug's trial conduct, disruptive, the Court of Appeals held that such behavior did not raise a question of competency to stand trial. *See Trimble*, 321 Md. at 254–56 (concluding that the court was not required to hold an additional competency hearing despite the defendant's "bizarre behavior," which included painting a red cross on his shaved head and making obscene gestures); *Thanos*, 330 Md. at 584–87 (holding that the defendant's documented history of mental illness and his "obnoxious comments and angry outbursts throughout the proceedings" did not obligate the court to inquire into his competence when the defendant interacted with the court and his attorney and "clearly understood the proceedings against him")

In contrast, the transcript of the trial proceedings reveals that Sibug presented himself as an individual with strong religious views which, he believed, supported his actions. But there were no outbursts from Sibug during the trial, no obnoxious or aggressive comments to the court or to counsel, and no vulgar gestures or actions. Indeed, his participation in his trial was respectful and his testimony was responsive to the questions posed by defense

16

counsel and the State. Quite simply, there is nothing in the record that would indicate to the court that Sibug lacked a rational or factual understanding of the proceedings or the ability to assist in his own defense.

We conclude that the issue of Sibug's competence to stand trial was never before the circuit court at his new trial as it was not raised by counsel, the court, or Sibug's courtroom behavior. As such, the circuit court did not err in not determining whether Sibug was competent, because the issue was not before it.

**II.**

Sibug contends that the circuit court erred in finding, at the sentencing hearing following his second trial, that he was competent when he stood trial, without holding a competency hearing, as his counsel requested. He further claims that the court did not base its decision that Sibug was competent on an "adequate record."

As we previously noted, section 3-104(a) of the Criminal Procedure Article requires a judicial determination of a defendant's competence to stand trial only if the question of competence is raised before or during the trial. And, as we stated earlier, Sibug's competence to stand trial was never made an issue before or during his trial. Accordingly, section 3-104(a) is not applicable to this case, and the court had no obligation to make a judicial determination of Sibug's competence.

Nonetheless, the court decided that it "could" hold a hearing under the auspices of section 3-104(c) of the Criminal Procedure Article, which states: "At any time before final

17

judgment, the court may reconsider the question of whether the defendant is incompetent to stand trial." And, although the court was only required, under section 3-104(c), to consider "evidence presented on the record during the course" of the trial with regard to Sibug's competency, *Peaks*, 419 Md. at 259, the court nonetheless gave Sibug's counsel the opportunity to proffer additional evidence in support of the allegation that Sibug was not competent to stand trial. Sibug's counsel, however, responded that he was "not prepared" at that time to present evidence "to suggest competency or incompetency" and that he was basing his request for a competency determination on his "observation[s] and [his] consistent contact" with Sibug. The court then determined that Sibug was competent to stand trial.

In concluding that Sibug was competent to stand trial, the court noted that neither Sibug nor his counsel had alleged, before or during the trial, that his competence was in question. Then, after noting that the last letter from Perkins stated that, in its opinion, Sibug was competent to stand trial, and after observing that Sibug "seemed to understand exactly what was going on" at trial, the court found that Sibug understood "the nature of the proceedings against him, [that] he was able to assist in his own defense," and that he was therefore competent to stand trial.

In sum, at Sibug's sentencing, the court held a hearing on the issue of Sibug's competence, even though it was not required to do so. At that time it offered Sibug's counsel the opportunity to present additional evidence on that issue and, when no further evidence was offered, it based its determination that Sibug was competent on the information provided

18

in the court file and on its personal observations of Sibug during trial.  We find that the court

did not err in so finding.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.  COSTS TO BE PAID BY APPELLANT.**